OLAF FRODEN v. HARLAN F. RANZENBERGER.[1]

March 17, 1950.

No. 34,948.

[1]Reported in 41 N. W. (2d) 807.

*Robb, Robb & Van Eps,* for appellant.
*L. L. Duxbury* and *Carroll & Thorson,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying plaintiff's motion for a new trial after a verdict for defendant.

The accident out of which this action arises occurred on August 1, 1947, at a point on a new grade some 750 to 1,500 feet south of the intersection of highways Nos. 76 and 44 near the city of Caledonia. Prior to the road construction out of which arose the events upon which this action is based, highway No. 44 ran in an east-west direction through the city of Caledonia. At about the west edge of the city, this highway was intersected by highway No. 76, coming from the south. Between this intersection and the city proper east of the intersection, highway No. 44 is in the form of an S, near which a creamery is located. In the fall of 1946, the Minnesota highway department rerouted highway No. 44 so as to follow south from the intersection and to run generally over highway No. 76. To this end, the roadbed of old No. 76 was eventually torn up for some distance, new grades were established, and the roadbed reconstructed. The project was commenced in the fall of 1946 and was substantially completed in October 1947. Caledonia and Spring Grove (before work was commenced on this project) were connected by old highway No. 76 and highway No. 44 and also by old highway No. 44 and a north-and-south road lying west of highway No. 76. This road was designated as the detour for old No. 76.

Plaintiff contends that during progress of the construction work the commissioner of highways closed old No. 76 from its intersection with old highway No. 44 for a distance of some ten miles to

the south and established the detour above referred to; that board barricades about 8 feet high and 10 to 14 feet long, painted white, on which were written or printed in black the words "Road Closed, Take Detour," were furnished by the highway department and placed at both ends of the ten-mile stretch; and that a similar barricade was placed on open highway No. 44 east of the intersection near the S curve and the creamery as an advance warning to motorists to use the established detour.

Defendant claims that highway No. 76 was not closed by the commissioner of highways; that there was nothing on the signs to show that the closing was by authority of law; and that the barriers were removed at times during the construction period.

Plaintiff concedes that a number of farms adjoining old No. 76 between the barriers at the north and south ends of the construction had no means of ingress or egress except over the new construction, and that the occupants of these farms and necessary service traffic, such as mail, delivery, and the like, were permitted to drive over the new construction, but claims that all other traffic was prohibited, both by the signs and by men working on the job.

Defendant testified that he had been in Caledonia the afternoon of August 1, 1947, and there met, among others, his uncle, Albert Ranzenberger. It appears that his uncle, who had been injured in another accident some time before, was residing with another uncle, Leonard Ranzenberger, who lived on a farm on highway No. 76 or adjacent thereto. Defendant offered to take his uncle Albert to Leonard's farm that evening, and they left Caledonia between five and six o'clock. He followed old No. 44 until he got to the intersection and turned south onto the new grading of No. 76. *He said that there was no sign on the road at that point or time* to the effect that he should not go there, but admitted that he has seen one there "sometimes." He stated that he was driving his 1937 two-door Ford at about 30 miles an hour when he first entered the new grade; that the roadway was dry and he was driving on the west side; that about where he entered the new stretch of road there was a small grade, which he ascended; that as he was driving along

(south) he saw three men standing along the west shoulder of the road; and that two of them crossed to the east side about 100 feet ahead of him, but that one man, *the plaintiff,* was standing on the west shoulder, "and I figured he was going to wait for me, so I drove through. About the time I got even with him, he stepped into [*sic*] the car." Defendant claims that as the other two men crossed the road he slowed down his car and was going about 10 to 15 miles an hour when plaintiff "stepped in front of the car."

Defendant's uncle Albert, who was riding with him at the time of the accident, testified that he was living at that time with his brother Leonard and that there was no way to get to Leonard's farm on August 1, 1947, except to go on new highway No. 76; that he went to Caledonia about noon that day and noticed the sign at the creamery, but that the sign at the intersection of highways Nos. 44 and 76 was lying down in the gutter on the south side of No. 44 and the east side of No. 76; and that it was still in the gutter when he went to Leonard's home with defendant just before the accident. He said that defendant was driving at the rate of about 30 miles an hour as they came over the top of the hill and then slowed down to "between 15 [miles] or better," but that he could not recall how fast he was going at the time of the accident.

Plaintiff, about 63 years of age, was working for the road contractors who had the construction job. His witness, Ralph Louis Timm, testified that the accident happened on a downgrade of the new construction about 1,500 feet from the intersection above mentioned. According to the record, plaintiff and two fellow workers, Anton Carleen and Douglas J. Schumacher, had been doing some "rip-rap" work "in the [west] ditch on the slope." At the close of work that day, a pickup truck belonging to the contractors came from the south along the new grade and picked up workers along the route. The conveyance stopped on the right-hand (east) side of the packed portion of the new construction, facing north, opposite the place where plaintiff and his two working companions came up from the ditch.

It also appears that at that time there was a piece of machinery known as a compressor standing on or near the new grade, somewhere north of the scene of the accident, the exact position being in conflict. Schumacher, the employe who put it there, said that it was on the west side of the road at an angle, with about five or six feet of the back end blocking the hard part of the road, and standing about 100 feet north of where he, plaintiff, and Carleen came onto the new grade. Other witnesses for plaintiff located the compressor in substantially the same place. Defendant admits that he saw the compressor, but says that it was "Off the side of the road" 200 or 300 feet north of the place where his car and plaintiff came in contact. His uncle, riding with him, placed it in about the same position as testified to by defendant.

The testimony of plaintiff's witnesses is in conflict with that of defendant's as to just how the accident happened. There seems to be no dispute that when the three men, including plaintiff, came out of the ditch to get into the truck on the opposite side of the grade Carleen was ahead of the other two and made the crossing in safety. There was testimony that they looked to the north before crossing the road, but that they did not see defendant approaching. According to plaintiff's witnesses, Schumacher and plaintiff were together; that as Schumacher started to cross over to the truck plaintiff stopped to pick up his jacket and then started to cross the road slightly to the rear of Schumacher; and that just as the latter had almost reached the left front of the truck and plaintiff was six or eight feet out from the west side of the grade defendant came from the north around or past the compressor without giving warning, narrowly missed Schumacher, and struck plaintiff with the right front fender of his car.

Plaintiff did not remember what happened immediately after the accident. He testified that he was standing on the west side of the road with Schumacher and Carleen, who started out for the waiting truck ahead of him, and that he took a step ahead and was going to pick up his jacket, when all at once he was hit. He said that when he came out of the ditch and before he picked up his

jacket he looked to the north and saw nothing except the compressor about 85 or 100 feet away, but that there was no car between him and the compressor when he looked, and that after picking up his jacket he took "about a step and a half" and was hit. He said that he never saw the car that hit him and that he did not think any horn was sounded, since he heard no warning.

The questions for our consideration are substantially these:

(1) Does that part of M. S. A. 169.21, subd. 3, which requires that "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway," apply under the facts and circumstances of this case to a workman rightfully in the course of his employment on a highway under construction?

(2) Does the evidence sustain a verdict adverse to plaintiff?

Plaintiff assigns as error:

(a) That the court erred in charging the jury, as quoted from § 169.21, subd. 3, and that it erred in connection with other statements made in its charge to the jury, to wit:

"Now, we in this case are not concerned with whether or not he [defendant] had a right to be on the road; so far as this case is concerned, he had a right to be there.

\* \* \* \* \*

"So the Commissioner of Highways could have closed it to all traffic \* \* \* you should determine how much he permitted; not because it affected Ranzenberger's right to be there, \* \* \*."

(b) That the court erred in denying plaintiff's motion for a new trial for the error specified in his first assignment.

(c) That the court erred in denying plaintiff's motion that the verdict is not sustained by the evidence.

It is plaintiff's position that the highway involved was closed to traffic generally, but open to adjoining landowners; that defendant was not an adjoining landowner and was not using the road under

construction as a means of access to any adjoining land, but was using it without permission and for his own convenience. Defendant argues that there is nothing in the evidence to show that the commissioner of highways authorized the closing of the highway; that plaintiff had worked on this construction job for about two weeks, and, for about a week before it happened, he had worked alongside the roadway where the accident occurred; that he knew there was traffic on this road the week before he was injured; that plaintiff knew that farmers and others were driving pickups, trucks, and other cars on the new grade during the time he was working alongside the road; that the road was not completely closed; and that some farmers and necessary service trucks were permitted to drive on it.

■ Reviewing the court's charge to the jury in its entirety, as we must necessarily do, and not just excerpts taken from various parts of the charge, we find no error under the facts and circumstances of the instant case which would constitute reversible error.

While the record shows that the court included in its charge that part of § 169.21, subd. 3, assigned as error, it also charged, immediately prior thereto, that every motor vehicle, when operated on the highway, shall be equipped with a horn in good working order and capable of emitting sound audible under usual conditions at a distance of not less than 200 feet and, when reasonably necessary to insure safe operation, give audible warning with the horn; and that every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and give warning by sounding the horn when necessary. Immediately following the reading of the portion of § 169.21, subd. 3, assigned as error, the court also read to the jury the last paragraph of the same section and subdivision of the statute, which provides:

"Notwithstanding the provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and give warning by sounding the horn

when necessary and exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

Plaintiff concedes that the record does not contain any specific exceptions to the portions of the court's charge sought to be reviewed, and the court in its memorandum states that no exceptions were taken to the charge.

Since the enactment of L. 1945, c. 282 (M. S. A. 547.03, subd. 2), the necessity of taking an express exception to "any adverse ruling, order, decision or instruction of the court on a matter of law" has been wholly eliminated. Of course, an exception may be used as a means of directing the trial court's attention to an alleged error, but such purpose may also be accomplished by an adequate objection, an explicit offer of proof, or by some other means which seasonably and unmistakably directs the court's attention to the error. In Foster v. Bock, 229 Minn. 428, 432, 39 N. W. (2d) 862, 865, we held:

"* * * Although a formal exception need not be taken to an inadvertent omission or error in a trial court's instruction to the jury, such omission or error is no ground for granting a new trial unless the trial court's attention has been seasonably directed thereto in some manner."

To the same effect, see Storey v. Weinberg, 226 Minn. 48, 51-52, 31 N. W. (2d) 912, 915.[2]

While we can find nothing in the record here to convince us that plaintiff seasonably called the court's attention to the claimed errors at law in connection with its charge so that corrections could have been made, if necessary, before the jury retired, plaintiff did set out in his motion as one of the grounds for a new trial, as permitted by § 547.03, subd. 1, that the court erred in submitting to the jury

---

[2]The soundness of requiring that the trial court's attention be *seasonably* directed to an alleged error has long been recognized. Dehen v. Berning, 198 Minn. 522, 528, 270 N. W. 602, 605; State v. VanGuilder, 199 Minn. 214, 216, 271 N. W. 473, 475; see, Vanderbilt, Minimum Standards of Judicial Administration, pp. 321, 332, 562.

the provisions of § 169.21, subd. 3. A review of the court's entire charge, however, satisfies us that, considered as a whole, there was no prejudicial reversible error.

It is also our opinion that the court's refusal to give certain instructions to the jury, as requested by plaintiff in writing, to the extent of those instructions, did not constitute error so as to justify a reversal in the case at bar.

■ Plaintiff contends that the verdict is not justified by the evidence and is contrary to law.

Viewing the evidence in the light most favorable to the prevailing party, as we are compelled to do, this court has repeatedly said that a verdict will not be set aside unless it is manifestly and palpably contrary to the evidence. 1 Dunnell, Dig. & Supp. § 415; Solosky v. J. A. Johnson Co. 223 Minn. 390, 27 N. W. (2d) 282. Upon an appeal involving the sufficiency of the evidence to justify a verdict, it is not necessary for the supreme court to review and discuss the evidence to demonstrate the correctness of the verdict. Cooper v. Hoeglund, 221 Minn. 446, 22 N. W. (2d) 450; Magnuson v. Burgess, 124 Minn. 374, 145 N. W. 32. A verdict "should not be set aside merely because it is contrary to a slight preponderance of the evidence, or because the appellate court would have found differently, or would have been better satisfied with a contrary verdict, * * *." 1 Dunnell, Dig. § 415. In this respect, the trial court said in its memorandum:

"Had the court been trying the issues here it might have been inclined to find for the plaintiff. However, there is ample evidence to sustain the verdict and the court cannot set it aside."

The conflict in the evidence resolved itself into a fact question for the jury to decide as to the negligence of defendant and the contributory negligence of plaintiff, the court having instructed the jury as to the rules of negligence applicable to the case. While the evidence here was such that it was possible for reasonable men to differ, nevertheless the jury found for defendant, and, since the

verdict is supported by the evidence, in the absence of other errors, it must be affirmed.

■ Another conflict in the testimony existed as to whether the road was closed to traffic, with certain exceptions, by the commissioner of highways at the time of the accident and whether the barricade was standing in the road at the intersection of "76 and 44" at the time defendant entered the new construction just prior to the accident. Section 161.03, subd. 7, provides in part as follows:

"When during the construction work on any trunk highways it may be necessary to prevent traffic from passing over any portion of such highway in order to avoid damage to the work under way the commissioner of highways is empowered to close such portions of the highway to any or all traffic by causing to be posted in a conspicuous manner at the ends of the portion of the highway so closed suitable signs warning the public that such road is closed under authority of law, and by the erection of suitable barricades, fences, dikes, or other obstructions."

There is nothing in the record to show that the commissioner of highways unequivocally closed that portion of the new construction under consideration here to any and all traffic before the date of the accident, as he was empowered to do under the statute. While it appears that barricades were furnished by the highway department sometime in 1946, when work was commenced, no one testified as to just when they were placed. Ralph Louis Timm, foreman of the contractors, came out on the job in November 1946 and was still there on the date of the accident. He said that there was a blockade set up at the intersection of old 44 and old 76, but did not know just when it was put there, since some other foreman had charge of that. He claimed that the barricade was always up, except when men were working down through that part of the road. When questioned as to what was done by the contractors or the highway department, in addition to this barricade, to keep traffic off "old 76" during the spring and summer of 1947, he said: '

"* * * There were a number of them turned around, and later on in the season, *which was after the accident,* there were men posted right at the barricade to keep the traffic off altogether * * *." (Italics supplied.)

He also testified that "The Minnesota Highway Department, after August 1st [the date of the accident], placed men on the end of the road—placed men down at the barricade, and nobody went through only the farmers that lived on it."

In addition to the testimony of defendant and his uncle that the barrier was not up at the intersection of "76 and 44" on August 1, Otto Kohlmeier testified for the defense that the barrier was lying in the ditch on the east side of the road on the day of the accident and that he had seen it there "a couple of days." Other witnesses for defendant testified to the effect that the new construction was suitable for travel on the day of the accident; that the barricade at this intersection was not always up; and that many cars were driving through on the new grade.

It is apparent here that even though barricades or signs were placed at the intersection of "76 and 44" at some stage of the construction, as well as at the creamery and at the other end of the new construction, the work had progressed so far by August 1, 1947, that neither the contractor nor the highway department was making any great effort to keep the public from using the new construction on the date of the accident. It also appears that even during the progress of construction some farmers living along the route, as well as deliverymen and the mailman, were permitted to use the new grade at the time of and prior to the date of the accident. We cannot say here that, under the circumstances, where defendant was taking his uncle to the place he was staying with another uncle, who lived on or adjacent to the new construction work, defendant was wrongfully on the roadway at the time of the accident.

It appears to us that § 161.03, subd. 7, gives the commissioner of highways ample authority to close such portion of a trunk highway under construction as may be necessary to prevent any or all traffic

from passing over it during construction. This may be done by causing to be posted in a conspicuous manner at each end of the portion of the highway so closed suitable signs warning the public that such road is closed under authority of law. It seems to us, however, that when it is the commissioner's intention to actually close such a highway to any and all traffic except permissive users, such as farmers residing along the route of the new construction, it must be done more effectively than was done in the case at bar. There is testimony here that there was considerable traffic over the new construction on the date of the accident and that there had been for some time prior thereto; that the barricades did not close the road completely, but left sufficient room for cars to pass on either side; and that the highway department placed men at the barricades *after* the accident to prevent others than farmers living along the new grade from passing through. It also appears that printed on the barricades were only the words "Road Closed, Take Detour," and no warning that the road was closed under authority of law. Finally, we have the disputed question whether the barricade at the intersection of "76 and 44" was on the road or in the ditch on the date of the accident.

Under the record here we must affirm.

Affirmed.