MARTIN O'NEILL, SR., v. WILLIAM MUND AND OTHERS.[1]

November 9, 1951.

No. 35,473.

[1]Reported in 49 N. W. (2d) 812.

*Bundlie, Kelley, Finley & Maun* and *Mandt Torrison,* for appellant.

*Sexton, Tyrrell & Jardine,* for respondents.

Frank T. Gallagher, Justice.

Appeal from a judgment of the district court.

The action was brought by the father as special administrator of the estate of Martin O'Neill, Jr., to recover damages for the alleged wrongful death of his son, which resulted from a collision between a toboggan upon which the boy was riding and a truck owned by defendant Connelly Contracting Company and driven by defendant William Mund while making deliveries for Montgomery Ward & Company, Incorporated. The action against the latter company was dismissed by the trial court. A verdict was returned for the other defendants. After the court denied a new trial, judgment

was entered for defendants, from which this appeal was taken.

The incidents leading up to the fatal accident are substantially as follows:

On December 28, 1946, during the Christmas holidays, Martin O'Neill, Jr., referred to hereinafter as Martin, Jr., went sliding with a group of six companions. He was nine years old and had just been presented with a toboggan for Christmas. The group had two toboggans. They left the O'Neill home about 1 p. m. The day was cold and crisp and somewhat cloudy, but it was not snowing. The oldest member of the group was Tom Hjelm, then 13 years of age; the youngest was Peggy O'Neill, decedent's sister, then aged seven.. En route to a sliding place on the Highland Park golf course, they found a group of children sliding on a hill just west of Lexington parkway in Highland Park and located northwest of the intersection of Lexington parkway and Montreal and West Seventh streets, where the group stopped. Estimates of the number of children sliding on the hill with skis, sleds, and toboggans vary from 15 to 50. Some of the girls in the party had slid down the hill toward the west, away from Lexington parkway. Tom Hjelm had made one slide down the hill to the east and into Lexington parkway. His momentum carried him about halfway across the street. Immediately before the accident, a boy named Eddie Murray and Martin, Jr., were seated on the latter's toboggan at the top of the hill. After debating whether to follow the Hjelm boy down the hill, they concluded not to do so. They were seated on the toboggan, facing backward, Murray at the front of the toboggan and Martin, Jr., at the rear, when another boy pushed the toboggan with his foot, starting it down the hill. The boys on the toboggan succeeded in turning around and facing the front when approximately halfway down the hill. Tom Hjelm, who was climbing back up the hill, made a jump at the toboggan as it went past him for the purpose of hitching a ride. He missed, and the toboggan proceeded toward the street.

In the meantime, defendants' truck had attempted to make a delivery for Montgomery Ward & Company on Race street, about

a block and a half from the point where the tragedy occurred. Not finding the customer home, the driver of the truck, accompanied by a helper, Leonard Pundy, proceeded less than a block to Lexington parkway, turned south on the parkway for about a block, when the accident occurred. He had planned to go to a grocery store on West Seventh street, where he hoped to reach the customer by telephone. There was some ice and snow on the street; one witness said that it was "packed with snow." The driver of the truck said that he saw children playing on the hill and at the bottom of the hill, but claimed that he did not see them sliding or pulling sleds, toboggans, or skis. He said that he had been watching them to see that none of them slid into the street. He estimated that there were about 15 children in the group, but did not attempt to count them. He said that he did not see the toboggan on which Martin, Jr., and the other boy were riding, but "felt a thump" when the accident occurred. The boy in the front of the toboggan, Eddie Murray, said that he saw the truck when he was about 25 feet from the street, just before the collision occurred. It appears that he succeeded in ducking down so that he and the toboggan passed completely underneath the truck and crossed the street. Martin, Jr., in the rear, was killed. He was apparently run over by the left rear wheel of the truck. The driver said that he stopped within eight or ten feet after the impact and that the O'Neill boy was lying about six feet directly behind the truck. Another witness said that it was about 18 feet; the testimony of others varied as to the distance. Measurements by a police officer indicated that the body of the boy was 45 feet to the rear of the truck, which had not been moved after it stopped.

The principal errors assigned are that the court erred:

(1) In connection with certain instructions given to the jury, particularly with respect to taking from the jury all issues of negligence except the failure to maintain a proper lookout;

(2) In refusing to instruct the jury that ordinary prudence requires a high degree of care with respect to children in a posi-

tion which is or may become dangerous, particularly when engaged in play;

(3) In striking evidence relating to defective vision of the driver of the truck and precluding the discussion of such defects to the jury.

■ We find no reversible error on the part of the trial court under the record here in taking all issues of negligence from the jury except that of failure to maintain a proper lookout.

It is plaintiff's position that the evidence in this case justified and required submission to the jury of far broader issues than that of lookout alone; that the icy street, the known presence of a large number of children skiing, sliding, and tobogganing on an open hillside adjacent to the street, with the driver operating the truck at a speed not far from the maximum allowed, justified submission of the issues of speed and failure to maintain the truck under proper control; and that the speed of defendants' truck is inextricably tied into the question of lookout. He refers in his brief to the testimony of three of the girls in the group with decedent that day. They were at the top of the hill when Martin, Jr., and his companion were pushed or started on the ill-fated slide. The girls all claim that they saw defendants' truck when it passed a basement being constructed about 180 feet north of the point of the collision. One of these girls, aged 12 at the time, said that she did not notice the position of the toboggan when the truck passed the basement. She gave no estimate of the speed of the truck as it approached the scene of the accident, except to say that it traveled at about the speed trucks and cars usually travel in that locality. Another girl, aged ten at the time, did not notice the speed of the truck as it passed the basement, but said that the toboggan could not have been more than halfway down the hill at the time. The third, decedent's little sister, then aged seven, placed the position of the toboggan at the time she first saw the truck as around the middle of the hill, which would be about 100 feet from the point of the tragedy. She did not attempt to estimate the speed of the truck.

Another of plaintiff's witnesses, Allan L. Bostrom, first observed the toboggan with the O'Neill boy on it when it was about 25 feet from the sidewalk on Lexington, which he said was about five or six seconds before the contact between the toboggan and the truck. He estimated that the truck was going at the rate of 20 or 25 miles an hour at the time. On cross-examination, he recalled that he gave a statement three or four days after the accident to the effect that the boys on the toboggan approached the truck from a direction to the rear of the truck and were catching up to the truck as they came down the hill. With reference to whether the driver might have seen the toboggan, he said: "Well, maybe he would not have seen it. Maybe he could not have seen it."

The estimates of the speed of the truck at the time of the impact vary from 10 to 25 miles an hour. Defendant driver was not questioned upon cross-examination under the statute as to speed. His helper, Leonard Pundy, sitting beside him in the cab, testified that the truck was traveling at the rate of 15 to 20 miles an hour at the time of the accident. Another witness said 20 miles an hour. Defendants' witness Clifford Lindgren, himself a truck driver, first said that the truck was going 10 or 20 miles an hour, and then changed it to 10 or 15 miles. He testified that the toboggan was about "a quarter of the way" down the hill and that the truck was coming up Lexington when he first observed the truck and the toboggan from a distance of 150 feet, where he stopped his truck at the intersection of Montreal and West Seventh streets. He said that it was about 15 seconds from then until the accident happened. He further testified that the toboggan was going at such an angle behind the truck that it "would in a way catch up to the truck."

Without attempting to refer in detail to all the evidence in the case, it appears that none of the witnesses placed the speed of the truck in excess of 25 miles an hour as it approached the place where the accident occurred. While there is a conflict as to the angle from which the toboggan approached the truck, there is evidence that it came down the hill from a direction somewhat in the rear

of the truck at some angle under 90 degrees and that it was never in front of the truck. There was no evidence that the driver did not have the truck under reasonable control. The trial court instructed the jury that the only question of negligence which it could consider was the alleged failure to keep a proper lookout. The court then went on to charge that there was no evidence that the speed was unlawful or excessive or that the truck was not under reasonable control.

While the fact situation in the instant case was different in some respects from that in Draxton v. Katzmarek, 203 Minn. 161, 280 N. W. 288, it is our opinion that the reasoning there with reference to speed and lack of control is applicable here. In that case, a boy about eight years old was injured while sliding down a rather steep hill on one of the public streets of Duluth. He collided with the rear of defendant's automobile, which the latter was driving on one of the public streets intersecting the one on which plaintiff was sliding. The street on which plaintiff was sliding ended at this intersection. There had been heavy snowfalls, and the snow had been plowed back where plaintiff was sliding so as to make a path eight or nine feet wide, with steep snowbanks on each side estimated to be about three feet high for the first 125 feet back from the bottom of the hill. The path up the hill with the snowbanks on each side was described as a trough. It appears that the conditions under which the boy was sliding were such that the boy could not see defendant's automobile at the bottom of the hill and that defendant driver could not see the boy sliding down the hill. Just before reaching the intersection, defendant drove down a steep hill in second gear at about 20 miles per hour. During the last 50 feet before reaching the intersection his speed was between 15 and 20 miles an hour, at which rate he continued to cross the intersection. Plaintiff hit the rear left bumper and fender of defendant's automobile. The evidence was conflicting as to whether defendant knew that children used the hill for sliding. After a verdict for defendant, plaintiff appealed from an order denying his motion for a new trial. Upon appeal, plaintiff urged that the trial court erred

in not submitting the question of speed as bearing on the question of due care. Great stress was placed on a statute which provided that it was prima facie evidence of negligence for a driver of an automobile to drive in excess of 15 miles per hour when approaching within 50 feet of a street intersection when the driver's view was obstructed. This court said that, even assuming that the speed was prima facie evidence of negligence under the statute, in order to be a basis for recovery, it must have been a proximate cause of the injury. See, also, Provinsal v. Peterson, 141 Minn. 122, 169 N. W. 481; Markgraf v. McMillan, 197 Minn. 571, 267 N. W. 515; 5 Am. Jur., Automobiles, § 164. While there was a showing of excessive speed in the Draxton case, this court went on to say that, if the accident could not have been avoided or if it would have happened even though there had been an absence of excessive speed, such speed was not a material element or substantial factor in bringing about the accident; therefore, that it was not a proximate cause. It reasoned that a reduced speed would not have avoided the accident; that uncontradicted evidence showed that if the defendant had entered the intersection and proceeded across it at a reduced permissible speed of 10 or 15 miles an hour the only difference it would have made would have been the point where the sled would have struck defendant's car. The court then said (203 Minn. 165, 280 N. W. 290):

"* * * In such a situation speed is not a proximate cause. Eastburn v. U. S. Exp. Co. 225 Pa. 33, 73 A. 977; Wetherill v. Showell, Fryer & Co. Inc. 28 Pa. Dist. R. 259, affirmed 264 Pa. 449, 107 A. 808."

Deplorable as this case is, involving the life of a little boy attempting to enjoy his Christmas vacation with his friends, we cannot see, under the facts and circumstances here, especially where the record is devoid of any showing of excessive speed, that the speed of the truck could be considered as the proximate cause of the accident. We have also examined the record and fail to find any evidence that defendant driver did not have the truck under proper control. It is our opinion that the trial court did not err in with-

holding the issues of excessive speed and proper control under the record here.

■ In connection with plaintiff's next assignment, that the court erred in giving or refusing to give certain instructions with reference to the degree of care required with respect to children, there appears to have been no reversible error.

In Carlson v. Sanitary Farm Dairies, Inc. 200 Minn. 177, 273 N. W. 665, complaint was made of the charge in respect to what was required with reference to the degree of care toward children. The court there suggested a charge to the effect that where children are known or may reasonably be expected to be in the vicinity a degree of vigilance commensurate with the greater hazard created by their presence or probable presence is required of a driver to measure up to the standard of what the law regards as ordinary care, citing Erickson v. M. St. P. & S. S. M. Ry. Co. 165 Minn. 106, 115, 205 N. W. 889, 893, 45 A. L. R. 973.

Again, in Draxton v. Katzmarek, 203 Minn. 161, 280 N. W. 288, *supra,* where the evidence was conflicting as to whether the defendant knew that children were using the hill for sliding, this court approved the trial court's charge that where children are known or may reasonably be expected to be a degree of care commensurate with the greater hazard created by their presence or probable presence is required of an automobile driver; that if the defendant knew, or by the exercise of reasonable care should have known, that children were accustomed to slide on the hill in question, then the defendant was required to anticipate such dangers as reasonably might be expected from such sliding and to exercise such care and caution to avoid injuring children sliding on the hill as a reasonably prudent and careful person would exercise under the same or similar circumstances. While the foregoing is but a summary of the charge on the questions stated in that case, this court said that the charge as given fully and impartially stated the rules of law applicable to the situation disclosed by the evidence. In reviewing a court's charge to a jury, we must do so in its entirety. Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807.

A review of the trial court's charge with reference to its instructions regarding the degree of care required with respect to children satisfies us that there was no reversible error in connection with that question raised. The court charged in substance that where children are known or may reasonably be expected to be in a certain vicinity at play a degree of vigilance commensurate with the greater hazard created by their presence or probable presence is required of a driver to measure up to the standard of what the law regards as ordinary care. It then said that in determining whether or not the driver exercised reasonable care the jury should bear in mind that a person driving a vehicle on the streets may assume that persons will not make an unreasonable use of the streets; that they will exercise reasonable care for their own protection; and that the driver of the truck had a right to assume that children would not cross or enter upon the street in the course of their sliding. Then followed this statement in the court's charge:

"* * * If, however, the driver of the defendants' truck saw or should have seen in the exercise of ordinary care that children were sliding on the hill and playing in the vicinity under circumstances which would cause a reasonably prudent person to apprehend that some of the children might run or slide into the street, then it became his duty to exercise that degree of care, to guard against accidents with such children, as would be exercised by a person of ordinary care under those circumstances."

Plaintiff's requested instruction with reference to the degree of care required was to the effect that ordinary prudence required a high degree of care with respect to children in a position which is or may become dangerous, and that this is particularly true in play or other occupations which so far absorb their attention that they are oblivious to approaching danger. We believe that the charge as given by the trial court here in connection with that point was sufficient.

Plaintiff next raises the issue whether the trial court erred in striking evidence relating to defective vision of the driver of the truck and precluding discussion of such defects to the jury.

122

It appears from the record that defendant Mund's driver's license restricted his operation of a motor vehicle to times when he was wearing proper corrective eyeglasses. When questioned on cross-examination as to the condition of his eyes, he said, "They are good." His attention was later called to the restricted license which required him to wear a certain type of glasses. He was then asked if he was wearing those glasses at the time of the accident, and he said that he was and that they were the same glasses as those he had on at the time of the trial. No further attempt was made to show any defect in the witness's vision, and there appears to be nothing in the evidence which would permit the jury to infer that Mund's vision was not adequate at the time of the accident. Upon oral argument before this court, plaintiff attempted to show that glasses and frames could obstruct one's vision in certain directions, especially on either side; but there is nothing in the record which would justify the jury in finding that this occurred. While plaintiff was not permitted to refer to this matter in his argument to the jury, it appears that the ruling of the court striking the testimony was made out of the presence of the jury and that the jury had the testimony referred to before it for whatever it was worth, so we cannot see that plaintiff was prejudiced to any degree which would require a reversal on that point.

While plaintiff assigned as error the granting of defendants' motion to dismiss as to Montgomery Ward & Company, Inc., he states in his brief that, since the other defendants appeared financially responsible, he perhaps should not be too concerned over that action, although he did not want to waive his rights. This matter was not emphasized by either party on oral discussion, and it would appear that there was no error in connection with such dismissal.

Affirmed.