MARY V. CAMERON AND ANOTHER v. MARTIN EVANS, JR., AND ANOTHER, *d. b. a.* CITY CAB COMPANY, AND ANOTHER.[1]

Februry 11, 1954.

Nos. 36,007, 36,008, 36,009, 36,010.

[1]Reported in 62 N. W. (2d) 793.

*Gordon Rosenmeier* and *John E. Simonett,* for appellants Evans.
*Vernon J. Schweiger,* for appellant Mrozik.
*Austin L. Grimes,* for respondents.

DELL, CHIEF JUSTICE.

These are appeals from an order denying the defendants' motions for new trials in two actions which were tried together below and on appeal were consolidated for disposition. The question of liability is not disputed. The relief sought is a new trial on the issue of damages only in each case.

The questions to be determined in each case in order to reach a decision are: (1) Did the court err in submitting the issue of permanent injuries to the jury? (2) If the issue of permanent injuries was for the jury, did the court err in the method and manner in which the issue was submitted? (3) Are the damages excessive?

In determining whether the evidence was sufficient to submit the issue of permanent injuries to the jury we consider and state it in the light most favorable to the plaintiffs. On December 16, 1950, plaintiff Mary V. Cameron, wife of plaintiff Darrell P. Cameron, while riding as a passenger in a taxicab in Little Falls, was thrown from it in an accident and dragged for a distance. She was unconscious for a short time. She received injuries principally to her head, back, hip, and left leg. Her most serious injury was a compression fracture of the seventh thoracic vertebra. She was taken to the hospital where she was confined in bed until December 23 at which time a body cast was applied. On December 24 she was taken to her home where she remained in bed most of the time until Febru-

ary 5, 1951, at which time she returned to the hospital and the cast was removed. She was then fitted with a Taylor-Goldthwaite brace which she wore until August 28 at which time the brace, because of her pregnancy, was changed to a prenatal or maternity support. After the birth of the baby in December 1951, she resumed wearing the brace for part of the day principally in the morning when bathing and caring for her child. She continued to wear it up to and at the time of the trial in January 1952.

Prior to the accident Mrs. Cameron was in good health, did all of her own housework, was active and athletic, enjoying dancing, skating, and bowling. She had suffered no previous injuries. Since the accident she has had severe headaches, pain in her hip and left leg below the knee, and a great deal of pain in her back. She is required to take drugs for relief. She is unable to perform any of her household duties other than mending and caring, in part, for her baby. Since the accident the Camerons have employed a maid constantly in their home to do the work formerly done by Mrs. Cameron.

The seventh vertebra was compressed at the outset about 10 percent, the compression being inward and also on the left side. There was a widening and splintering of the bone in that area. The space between the sixth and seventh vertebrae was narrowed, and the disc or cartilage between those two vertebrae was damaged. The compression of the vertebra increased following the accident so that at the time of the trial it was permanently reduced, according to plaintiffs' medical experts, at least 20 to 30 percent from its normal size; and the intervertebral space between the sixth and seventh vertebrae was almost closed because of damage, not only to the bone, but to the cartilage between the vertebrae. Two doctors, who attended Mrs. Cameron, one an orthopedic specialist and the other a general practitioner, were called as witnesses for the plaintiffs. They testified that she had sustained a 20 percent permanent partial disability of the spine. In the light of this evidence, it would seem that the issue of permanent injuries was for the jury.

However, defendants contend that, notwithstanding the fact that the seventh vertebra will remain permanently compressed to the

extent of 20 to 30 percent of its normal size and even though the intervertebral space between the two vertebrae has been almost eliminated and the cartilage or disc largely destroyed, there is no resulting disability which can be characterized as permanent because there has been a normal healing process without nerve impingement and without limitation of motion of the spine. In support of their claim defendants insist that plaintiffs' medical experts arrived at their opinions of permanent partial disability because of pain suffered by Mrs. Cameron and arthritic conditions or "lipping" at the ninth and tenth thoracic vertebrae coupled with damage to the seventh vertebra and surrounding cartilage. They contend that there were no objective findings by the medical experts supporting Mrs. Cameron's subjective complaints of pain and that a finding of permanent injury cannot rest upon subjective complaints alone. They also claim that the arthritic condition between the ninth and tenth thoracic vertebrae existed prior to the accident and that it was, therefore, improper for plaintiffs' medical experts to give an opinion of permanent disability based, in part, upon that pre-existing arthritic condition.

■ This court has frequently stated that before a person may recover for permanent injuries it must appear to a reasonable certainty that there will be permanent injury.[2] Large verdicts must be closely scrutinized where the damages are based upon subjective symptoms only.[3] Courts must exercise much circumspection in sustaining large verdicts where there are no objective findings and the only evidence of the extent of the injury is the word of the person injured.[4] Thus, in Lowe v. Armour Packing Co. *supra,* it was held

[2]McBride v. St. Paul City Ry. Co. 72 Minn. 291, 75 N. W. 231; Crozier v. Minneapolis St. Ry. Co. 106 Minn. 77, 118 N. W. 256; Carson v. Turrish, 140 Minn. 445, 168 N. W. 349, L. R. A. 1918F, 154; Gau v. J. Borgerding & Co. 175 Minn. 150, 220 N. W. 412; Romann v. Bender, 190 Minn. 419, 252 N. W. 80.

[3]Propper v. C. R. I. & P. R. Co. 237 Minn. 386, 54 N. W. (2d) 840, and cases cited therein.

[4]Haugen v. N. P. Ry. Co. 132 Minn. 54, 155 N. W. 1058; Lowe v. Armour Packing Co. 148 Minn. 464, 182 N. W. 610; Levan v. C. R. I. & P. Ry. Co. 158 Minn. 69, 196 N. W. 673.

that, where objective symptoms indicate full recovery, a large verdict cannot be sustained because subjective symptoms described by the plaintiff indicate a continuance of the ailment resulting from the injury unless the evidence furnishes a basis for determining, with reasonable certainty, the future consequences to be apprehended.

Defendants, in support of their contention, point to some admissions, contradictions, and inconsistencies drawn from plaintiffs' medical experts in cross-examination. It is not uncommon for admissions, contradictions, and inconsistencies to appear in the testimony of witnesses during cross-examination even though the witnesses are entirely honest. However, in arriving at the meaning of the testimony of a witness and what it proves, the testimony must be examined and considered as a whole as brought out on both direct and cross-examination. Its meaning must be drawn from the entire testimony of the witness and not from isolated portions of it. This rule applies with equal force to the testimony of expert witnesses. It is for the jury, not the court, to determine the weight to be given to the testimony of a witness and to decide what the testimony of the witness proves.[5]

While it is true that some of the answers given by plaintiffs' experts standing alone might indicate that Mrs. Cameron's complaints of pain were entirely subjective, nevertheless, viewing their testimony as a whole it appears, from the type of fracture which she suffered, the almost complete destruction of the cartilage between the vertebrae, the scoliosis or lateral bending of the spine, the bruising of her head, back, left thigh and leg, the injury to the tendons and soft tissues, the arthritis which developed at the fracture site and its increase at the lower level, and the evidence of pain elicited by the experts upon pressure of the affected parts during their ex-

---

[5]Kapla v. Lehti, 225 Minn. 325, 30 N. W. (2d) 685; Klingman v. Loew's Incorporated, 209 Minn. 449, 296 N. W. 528; Sankiewicz v. Speckel, 209 Minn. 528, 296 N. W. 909; Kivak v. G. N. Ry. Co. 143 Minn. 196, 173 N. W. 421; Kundiger v. Prudential Ins. Co. 219 Minn. 25, 17 N. W. (2d) 49; 6 Dunnell, Dig. & Supp. § 10343a; Ryan v. Griffin, 241 Minn. 91, 62 N. W. (2d) 504.

amination, that there were sufficient objective findings present to support Mrs. Cameron's complaints and to justify their opinion that she was suffering and would continue to suffer pain on account of the injuries which she received in the accident.[6] Moreover, the opinions of plaintiffs' experts were corroborated to some extent by the opinions of two medical experts called by defendants who expressed the belief that she would suffer pain for a period of from six months to one year from the time of the trial and that at the time of the trial she was suffering from a 15 to 20 percent disability of the spine. Furthermore it should not be overlooked that both of plaintiffs' medical experts, after taking into consideration all injuries sustained by Mrs. Cameron in the accident, testified that she suffered a 20 percent permanent partial disability of the spine.

The experts on both sides agreed that there were arthritic changes or "spurs" at the fracture site of the seventh thoracic vertebra caused by the accident. They also agreed that there were arthritic changes or spurs between the ninth and tenth thoracic vertebrae. The initial X rays taken of Mrs. Cameron's spine on the day of the accident showed a minimal amount of arthritis between the ninth and tenth thoracic vertebrae. All experts agreed that the

---

[6]From the testimony of Dr. Hall:

"A. The findings that are present can easily produce the pain which the patient complains of."

"The Witness: From my examination and from the X-rays it is my feeling that the patient could have pain from what is found on examination and what is found on the X-rays."

"Q. Now, Doctor, on this question of disability which you mentioned at 20%, what do you principally determine as the cause of that disability?

"A. The patient's complaints, the finding of tenderness, the finding of the X-rays showing very definite compression of the vertebra with the narrowing of the disc space between the 6th and 7th vertebrae, the increase in the changes in the so-called lipping or natural healing process at that level and also at the lower level."

From the testimony of Dr. Johnson:

"A. Well the pain that she complains of is the result of the fracture. It is the result of the healing process. It is the result of the injury to the tendons and soft tissues around this fracture; and it is also partly the result of this spur formation."

arthritis then present was not due to the accident. Within the first six months following the accident the arthritis between the ninth and tenth vertebrae greatly increased. Defendants claim that there was no showing that the arthritic condition between the ninth and tenth vertebrae was aggravated by the accident. While here again portions of the testimony of plaintiffs' medical experts tend to support defendants in their claim, yet taking their testimony as a whole it fairly appears that the rapid increase in this arthritic condition during the first six months following the accident was due to the injury received in the accident.[7]

Dr. Hall referred to the arthritic condition between the ninth and tenth vertebrae on one occasion as an *aggravation* and on another as an *increase* in its size. He expressed the opinion that the increase was due to trauma. In cross-examination he said that trauma might be normal wear and tear. However, he eliminated normal wear and tear as the cause of the increased arthritic condi-

---

[7]From the testimony of Dr. Johnson concerning the ninth and tenth thoracic vertebrae:

"Q. You say most of that growth took place between December 16th, 1950, and June 11th, 1951, Doctor?

"A. Yes.

"Q. And in your opinion was that a rapid growth?

"A. Yes, it was during those six months.

"Q. Do you have any opinion as to what caused that growth?

"A. Yes. I think it was caused by trauma to the spine.

"Q. Trauma suffered when?

"A. On December 16th.

"Q. By reason of this injury?

"A. Yes."

From the testimony of Dr. Hall concerning the ninth and tenth thoracic vertebrae:

"B–25, taken again on 6-11-51, is another front view of the patient in the area here, showing again the compression of the vertebra, and again here the area I showed you below the fracture where the body is attempting to bridge across. There is some new bone again forming in this area, which shows the body again attempting to repair apparently some damage that was also done in that area. There is no fracture here, but apparently there was enough damages that the body attempted to repair in that area also."

tion between those vertebrae and placed the increase upon injury to the bone.[8] Under the evidence it was proper for plaintiffs' medical experts to take into consideration the increase or aggravation of the pre-existing arthritic condition between the ninth and tenth thoracic vertebrae in arriving at their opinions of the duration and extent of Mrs. Cameron's injuries.

Defendants contend that the opinions of plaintiffs' experts expressing permanent injury were premature since the evidence shows that it is probable that any pain from which Mrs. Cameron was suffering could be relieved either by exercises or by deep X-ray treatments. We think the evidence fairly construed shows that she was unable to discard the brace entirely and continue with the exercises prescribed by her doctors because of the pain which she suffered and that while deep X-ray treatments might relieve some of the pain there is no assurance that it would relieve all of it. We think the fair inference to be drawn from the testimony of her experts is that either exercises or deep X-ray treatments, at best, would only relieve part of the pain. The issue of permanent injuries in both cases was properly for the jury.

■ Defendants' objection to the manner in which the issue of permanent injuries was submitted to the jury is that the court failed to instruct the jury that there could be no allowance of damages resulting from the pre-existing arthritic condition of Mrs. Cameron principally at the ninth and tenth thoracic vertebrae level. Although a formal request to charge the jury to that effect was not made, the position of the defendants in that respect was timely called to the attention of the court and sufficiently noted in the record.

[8]From the testimony of Dr. Hall concerning the ninth and tenth thoracic vertebrae:

"The Witness: It was my opinion that the increase in size in the short period of time that it took place was not a normal wear and tear process, but due to trauma.

&ast; &ast; &ast; &ast; &ast;

"Q. And by trauma you mean a blow of some kind?

"A. Some type of injury to the bone, yes."

The jury was given the usual general charge applicable to actions of the kind under consideration here. It was told that the plaintiffs must prove the elements and amounts of their damages and that each item of claimed damage suffered was a proximate result of the negligence of the defendants. On the issue of permanent injuries in Mary Cameron's case, its attention was directed to the nature and extent of her claims as described by the witnesses, and it was instructed that it was to determine what the true facts were regarding her injuries and to award her such sum as would fairly and fully compensate her for such pain and disability as she had suffered and would suffer in the future. It was told that it could not speculate and would have to be satisfied by a fair preponderance of the evidence that future disabilities would, to a reasonable certainty, ensue before recovery could be allowed for future disability. In the Darrell P. Cameron case it was instructed that such sum should be allowed as would compensate him for any loss of services and society of Mrs. Cameron and here again it was cautioned that as to the future it could not speculate but would have to be satisfied by a fair preponderance of the evidence that such future loss would, to a reasonable certainty, occur before allowance for future damages could be made.

This court has often stated that the charge of the trial court must be viewed in its entirety[9] and from a practical and common-sense point of view.[10] The trial court is allowed considerable latitude in the language used,[11] and a new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law.[12] All that is required

---

[9]O'Neill v. Mund, 235 Minn. 112, 49 N. W. (2d) 812; Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807; Kapla v. Lehti, 225 Minn. 325, 30 N. W. (2d) 685; 6 Dunnell, Dig. & Supp. § 9781.

[10]Erickson v. Northern Minnesota Nat. Bank, 235 Minn. 232, 50 N. W. (2d) 489; Mailand v. Mailand, 83 Minn. 453, 86 N. W. 445.

[11]Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d) 180.

[12]State v. Becker, 231 Minn. 174, 42 N. W. (2d) 704; Honan v. Kinney, 205 Minn. 485, 286 N. W. 404; Doody v. St. Paul City Ry. Co. 198 Minn. 573, 270 N. W. 583; 6 Dunnell, Dig. & Supp. § 9777.

is that the charge as a whole convey to the jury a clear and correct understanding of the law. It is unnecessary that every possible opportunity for misapprehension be guarded against. If the charge fairly lays down the law of the case, it is sufficient.[13] Usually it is preferable to give a general charge, if practicable, upon the whole law of the case rather than to run the risk of overemphasizing one side of the case or confusing the jury as is often done by giving requested instructions or particularizing upon specific items.[14]

The case of Orth v. Wickman, 190 Minn. 193, 251 N. W. 127, is somewhat analogous to the case before us. There defendant requested the court, in view of the evidence and the argument of counsel for the plaintiff, to instruct the jury that it could not consider that any condition of the right kidney was a result of the accident. Physical injury to the right kidney was not claimed by plaintiff's medical experts although plaintiff complained of pain over the region of the kidneys and an analysis of the urine showed blood cells and albumen in the discharge from the right kidney. We there held that, the court having given a correct general charge as to damages, we could not say that it erred or that any prejudice was shown in the denial of the request.

While under the circumstances here it would perhaps have been better if defendants' suggestion had been followed in instructing the jury, we are not prepared to say that the failure to do so constituted error in view of the general charge.

■ Defendants claim that both verdicts are excessive. Whether a verdict should be set aside as excessive rests largely in the discretion of the trial court. It is the duty of the trial court to keep the jury within the bounds of reason and the duty of this court to keep the trial court within the bounds of judicial discretion. The action of the trial court will not be reversed on appeal unless it clearly appears that there was an abuse of discretion.[15] No particular purpose is

[13]Murray v. Wilson, 227 Minn. 365, 35 N. W. (2d) 521.

[14]Swanson v. LaFontaine, 238 Minn. 460, 57 N. W. (2d) 262; 6 Dunnell, Dig. & Supp. § 9778.

[15]Merrill v. St. Paul City Ry. Co. 170 Minn. 332, 212 N. W. 533; Quinn v. C. M. & St. P. Ry. Co. 162 Minn. 87, 202 N. W. 275, 46 A. L. R. 1228;

served by comparing verdicts. No two cases are alike. There is no yardstick that can be applied to all cases. The peculiar facts of each case must serve to measure the damages.[16]

Plaintiff Mary Cameron, at the time of the trial, was 26 years of age. Her life expectancy was 42.12 years. The verdict in her case was $21,000. Her husband, Darrell Cameron, was 28 years of age. The verdict in his case was $9,500. He sustained special damages due to the injuries which Mrs. Cameron received of approximately $2,000 to $2,500. While the verdicts are liberal and we would have been better satisfied had the trial court reduced them, we cannot say that the failure to do so constituted an abuse of discretion. The trial court should carefully scrutinize large verdicts and exercise caution, reducing them when necessary, so as to keep the jury within the bounds of reason.

Other alleged errors discussed in appellants' brief have been carefully considered. Since we have reached the conclusion that they are not of sufficient importance to justify granting a new trial, we purposely refrain from further comment.

Affirmed.

MR. JUSTICE KNUTSON took no part in the consideration or decision of this case.

Randall v. G. N. Ry. Co. 182 Minn. 259, 234 N. W. 298; Teryll v. St. Paul City Ry. Co. 125 Minn. 528, 147 N. W. 273; 5 Dunnell, Dig. & Supp. § 7136.

[16]Koenigs v. Thome, 226 Minn. 14, 31 N. W. (2d) 534; Odegard v. Connolly, 211 Minn. 342, 1 N. W. (2d) 137.