Donna **WALSTAD** and Lawrence Walstad, Plaintiffs-Appellants,

v.

**UNIVERSITY OF MINNESOTA HOSPITALS** and C. Walton Lillehei, Defendants-Appellees.

Donna **WALSTAD** and Lawrence Walstad, Plaintiffs-Appellants,

v.

Charles A. **MURRAY,** M.D., Carlos Ibarra, M.D., and Russell Stasiuk, M.D., Defendants-Appellees.

Nos. 20496, 20517.

United States Court of Appeals, Eighth Circuit.

May 10, 1971.

---

6. Cf. Hawkins v. Bennett, 423 F.2d 948 (8th Cir. 1970).

Robert Wm. Rischmiller, Minneapolis, Minn., for plaintiffs-appellants.

O. C. Adamson, II, Minneapolis, Minn., and James H. Geraghy, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendants-appellees.

Before GIBSON, HEANEY and BRIGHT, Circuit Judges.

GIBSON, Circuit Judge.

■ Plaintiffs, Donna Walstad and Lawrence Walstad, wife and husband, appeal from a judgment entered on a directed verdict at the close of plaintiffs' case in favor of defendants. Plaintiffs' complaint in this diversity case alleged negligent care and treatment by the physicians concerned and by the University Hospitals.[1] In passing upon the directed verdict by Judge Philip Neville, both federal and Minnesota law require us to view the credibility of the evidence and any inferences which may reasonably be drawn therefrom in a light favorable to the adverse party.

To fully understand our disposition of the issues raised on this appeal, it is necessary to set forth in detail the factual situation giving rise to the complaint.

Plaintiff Donna Walstad, a young woman of 30 years at the time of trial, suffered rheumatic fever when a child. On the advice of her family physician, she was admitted to the defendant University of Minnesota Hospitals in the fall of 1966 for an evaluation of her heart condition and for possible treatment by defendant Dr. C. Walton Lillehei, a recognized specialist in cardiovascular surgery. Upon admittance she was examined by Dr. Lillehei who explained to her that a number of tests would have to be made, that the evaluation tests would be performed by hospital personnel, but that he would perform any surgery required.

The examinations of Donna Walstad revealed very weak leg pulses and many abnormalities, the most serious being a systolic murmur, characteristic of a mitral valve insufficiency due to rheumatic fever. As part of the evaluation process, a heart catheterization was thought necessary.[2]

Dr. Charles Murray, a cardiovascular surgical resident working and studying under Dr. Lillehei, discussed this procedure at length with Donna Walstad and explained in detail the likelihood of some pain and discomfort and in general what might be expected in the way of side effects, though he did not inform her that complications arose in about 4 per cent of the cases.

1. A technical assault and battery is alleged against Dr. Murray, the operating physician in one of the operations performed. Neither Dr. Murray nor Dr. Ibarra were served with process in this case and hence are not parties to this proceeding. Consequently, our consideration of the appeal will be directed to the remaining defendants, Dr. C. Walton Lillehei, Dr. Russell Stasiuk, and the University of Minnesota Hospitals.

2. In order to perform this diagnostic study an incision must be made in the groin and a catheter is inserted into the left femoral artery. The catheter, a plastic tube slightly smaller than the diameter of the artery, is then pushed upward into the left common iliac artery and from there into the abdominal aorta and then into the heart. The progress of the catheter as it passes through the vessels is simultaneously observed by the surgeon on a television screen as motion picture X-ray cameras record visually the procedure. Once the catheter is in the heart, a contrast medium is rapidly injected through the catheter into the heart which enables diagnostic motion picture X-rays of the heart action to be taken.

Although Donna Walstad claims that she was under the impression that Dr. Lillehei would perform the catheterization and the hospital records reveal that Dr. Lillehei was scheduled as a surgeon for her heart catheterization, this operation was performed by Dr. Murray on October 4, 1966.[3] It is necessary that the patient be awake and alert during this type of operation and Donna did not object to Dr. Murray proceeding. She testified she experienced several severe pains in the lower left abdominal region as the catheter was advanced toward her heart. Immediately following the catheterization Dr. Murray found no pulse in the lower part of Donna's left leg. He immediately consulted Dr. Lillehei who was performing open heart surgery in a nearby operating room. Upon Dr. Lillehei's instructions Dr. Murray proceeded to perform another surgical procedure with a Fogarty catheter to locate and remove any possible blood clot or thrombosis in the lower left femoral artery that might be causing the lack of pulse in the leg. No thrombosis or blood clot was located but the pulse did return to Donna's leg.

Two days later on October 6, Donna Walstad was discharged with a heart diagnosis of severe mitral regurgitation and was informed that heart surgery would ultimately have to be performed. At the time of discharge Donna was experiencing pain in her left leg, but her left pedal pulse remained good. She was instructed to stay on digitalis for her heart and to return for further evaluation of her heart in approximately six months.

Donna continued to suffer pain in her left leg and the pulse in that leg gradually became very weak and was absent at the time she was readmitted to the University Hospitals on March 24, 1967. Dr. Lillehei assumed that there must be some obstruction in the left femoral artery and operated on March 31. Dr. Lil-

lehei found a small obstruction of the artery at the site of the incision made by Dr. Murray for the catheterization, which Dr. Lillehei rectified by taking a little piece of vein and patching the artery so as to widen it at that point (a patch graft angioplasty). During this operation it became apparent that Donna's collateral blood vessels were in poor condition as they did not satisfactorily serve as detours for blood flow to her lower leg. Following this operation, Donna complained of pain and numbness in her leg and an extremely sore throat but an adequate pulse did return to her leg.

Dr. Russell Stasiuk was the anesthesiologist during this March 31 operation. Because of her heart condition, it was necessary to insert a tube down Donna's throat in the course of administering the anesthetic. Tracheitis developed following the operation, so Dr. Stasiuk administered Ampicillin, a form of penicillin, to Donna for the purpose of treating the infection in her throat. Donna claims that when she complained of her sore throat to Dr. Stasiuk, he told her he was sorry, that he had used too big a tube. Dr. Stasiuk denies this conversation. Donna's sore throat continued for several days and apparently had cleared up by April 6.

Penicillin continued to be administered to Donna on at least 12 different days between March 30 and April 15, apparently at Dr. Lillehei's instructions. Donna was allergic to penicillin and this fact was noted on her hospital records back in October 1966. She testified that she had a skin rash on her arms and back throughout this two-week period.

On April 7, a femoral arteriogram was performed by Dr. Kurt Amplatz, an X-ray specialist in heart cardiovascular problems, which showed that the common femoral artery was again occluded. Because circulation in Donna's leg was still unsatisfactory on April 10, Dr. Lil-

---

3. The record reveals that at the University Hospitals heart catheterizations were routinely performed by cardiovascular surgery residents assisted by other techni-

cians and that Dr. Lillehei devoted himself exclusively to open heart and other intricate surgery.

lehei reopened the area of the previous incisions and, using part of the saphenous vein, constructed a bypass graft in the femoral artery around the site of the previous incisions. Donna was returned to the operating room later the same day when it became apparent that circulation in her lower left leg was still inadequate. Dr. Lillehei opened the popliteal artery behind her knee and again used the Fogarty catheter procedure up and down the femoral artery. Dr. Lillehei testified that no obstruction was located in the artery, but the hospital records state in a postoperative diagnosis that there was a thrombosis both in the common femoral artery and the common iliac artery of the left leg.

Donna was then placed in intensive care where it appears she received something less than highly professional treatment. On several occasions the Puritan Pot, which provided humidity for her throat condition in order to prevent her oral secretions from caking up, was without water. When Donna's sister, Mrs. Ione Kloster, visited her on the morning of April 14, she found Donna unattended and unable to talk, breathe or hold the oxygen mask. Mrs. Kloster fortunately was able to locate some nurses quickly, who in turn located the senior resident who immediately performed an emergency tracheostomy.

An adequate pulse did not return to Donna's leg following the April 10 operations; instead the leg became extremely cold and began to turn bluish-gray in color. Dr. Lillehei put Donna on Heparinn, an anti-coagulant, but her leg condition continued to deteriorate. Because of the lack of blood to her leg, it became gangrenous. Consequently, on April 14 Dr. Lillehei performed a below the knee amputation.

The pathological report on Donna's leg prepared by the University Hospitals' laboratory of surgical pathology revealed a very serious arterial disease below the knee which had caused a growth of tissue that nearly occluded the arteries' walls. Dr. Lillehei testified that the lack of circulation was caused by this arterial condition, which had developed over a number of months or years, and her poor blood flow, which was due to her faulty heart. Dr. Lillehei testified that the catheterization could not have caused the occlusion of the arteries in Donna's leg since even the smaller vessels were occluded, vessels which would under no circumstances be entered during a catheterization. Plaintiffs did not offer any contrary medical expert testimony.

The causes of action asserted by plaintiffs arise primarily from the heart catheterization by Dr. Murray (which plaintiffs theorize as causing the gangrenous leg condition), the March 31 intubation by Dr. Stasiuk, and the lapses in the hospitals' intensive care. With one minor exception, we agree with the evaluation of the evidence made by Judge Neville.

The major claim asserted by plaintiffs relates to the development of gangrene in Donna's leg due to inadequate circulation, which necessitated its amputation. Plaintiffs' claim that the poor circulation in Donna's leg was caused by the heart catheterization performed by Dr. Murray and that Dr. Lillehei as supervising physician is vicariously liable for the medical practices of Dr. Murray under the doctrine of respondeat superior. We disagree for there is no medical evidence either that this operation was performed negligently or that there was a reasonable connection between the act or omission of Dr. Murray and the damage suffered by Donna.

Under Minnesota law there can be no finding of negligence in a medical malpractice case in the absence of expert testimony to support it. Yates v. Gamble, 198 Minn. 7, 268 N.W. 670, 674 (1936); Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N.W.2d 426, 429 (1945). Dr. Murray appears on the record to be a fully qualified resident physician and had performed 50 to 90 heart catheterizations himself and had participated in the performance of over 100 other catheterizations. The fact

that he was not licensed as a physician in Minnesota is not relevant as under the Minnesota statutes he could practice medicine as a resident physician since he had obtained a temporary certificate for graduate training [4] and was practicing under the supervision of a physician licensed in Minnesota.[5] We must conclude that Dr. Murray possessed the requisite skill and learning of an average physician in good standing in his locality and that he utilized that skill and learning with proper care in the heart catheterization in question. Yates v. Gamble, 268 N.W. at 673.

The plaintiffs of course also have the burden of proof on the issue of the fact of causation and must introduce evidence which affords a reasonable basis for one to conclude that it is more likely than not that defendant's conduct was a substantial factor in bringing about the result. "In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused." Yates v. Gamble, 268 N.W. at 674 (Minn.1936). Proof of causation cannot rest on conjecture and the mere possibility of such causation is not enough to sustain the plaintiffs' burden of proof. Orth v. St. Paul, M. & M. Ry. Co., 47 Minn. 384, 50 N.W. 363 (1891). Furthermore, when the causal relation issue is not one within the common knowledge of laymen, causation in fact cannot be determined without expert testimony. Christensen v. Northern States Power Co., 222 Minn. 474, 25 N.W.2d 659 (1946); W. Prosser, Handbook of The Law of Torts, 245 (3d ed. 1964).

Plaintiffs' theory of causation is essentially that Dr. Murray lacerated an artery during the heart catheterization causing a thrombosis to develop in Donna's common iliac artery which so obstructed the supply of blood to her lower left leg that its circulation became inadequate. This theory of causation pyramids conjecture upon conjecture without the support of any expert medical testimony. Indeed, there is no evidence at all that an artery was lacerated by Dr. Murray, which is the major premise of plaintiffs' theory. Plaintiffs have failed to prove causation in fact.

Plaintiffs also contend that the heart catheterization performed by Dr. Murray was an assault and battery since a 4 per cent risk of complication is sufficiently high that Donna had a right to be advised of the hazards; and, since she did not have a complete understanding of the consequences of the operation, her consent was not operative as it was not knowingly and intelligently made. While an unauthorized or nonconsensual operation would constitute an assault and battery, Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 16 (1905), the evidence establishes that Donna consented to the catheterization by Dr. Murray. It is unfortunate if Donna was under the impression that Dr. Lillehei would perform this operation; however, Dr. Murray discussed it in detail with her and her husband and she made no objection before, during or after the operation to his performing the catheterization. The record further indicates that

---

4. M.S.A. §§ 147.16, 147.20.

5. Plaintiffs contend that Dr. Murray was negligent per se because his performance of the catheterization was allegedly unsupervised and therefore in violation of M.S.A. § 147.17, which provides:

"Such temporary certificate for graduate training shall entitle the holder thereof, under the direction and supervision of a person licensed and duly registered to practice medicine in all of its branches in this state, to perform, with-in such designated hospital only, the services prescribed by and requisite to such resident physician's training program."

We do not think this statute comprehends continuous detailed supervision of a resident while carrying out the medical practices for which he is in training. We conclude that Dr. Murray was supervised within the meaning of the statute and the evidence shows that he had developed a reasonable level of competency in the heart catheterization procedure.

heart catheterizations were routinely performed at the University of Minnesota Hospitals by resident physicians while Dr. Lillehei performed the relatively more important open heart surgery and similar intricate operations.

■ Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958), relied upon by plaintiffs, is distinguishable from the instant case. The Minnesota Supreme Court held in *Bang:*

"[W]here a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be informed of the alternative possibilities and given a chance to decide before the doctor proceeds with the operation." 88 N.W.2d at 190.

In *Bang* the physician failed to advise his patient that there were alternative methods of treatment and that the operation contemplated involved severing his spermatic cords (resulting in his sterilization). Here, not only was there no showing that alternative methods of evaluating Donna's heart condition were available but there was only a 4 per cent possibility of complication, most of which were not serious.[6] In light of the relatively minor complications which had occurred in previous catheterizations, we conclude that Dr. Murray's failure to inform plaintiffs of this 4 per cent complication factor did not vitiate their consent to the catheterization. Cf. Bowers v. Talmage, 159 So.2d 888 (D.Ct.App. Fla.1963).

■ Plaintiffs also argue that Dr. Lillehei was negligent personally in failing to remove an alleged thrombus in the common iliac artery of Donna's left leg in the operations he performed on her in March and April of 1967. While there can be no finding of either causation or negligence in the absence of expert testimony to support it, we are cog-

nizant that such evidence may be found in the testimony of the defendant physician. Sheffield v. Runner, 163 Cal.App. 2d 48, 328 P.2d 828 (1958). Dr. Lillehei testified that the only areas he explored for a thrombosis were from the point of Dr. Murray's incision down to Donna's ankle and up to the origin of the internal iliac artery where it meets with the common iliac artery. He further testified that he never found or removed a thrombus from Donna's leg. Hospital records dated April 10, however, indicate that a thrombosis was found in both the common femoral artery and the common iliac artery, and the hospital operative record, dictated and signed by Dr. Lillehei on April 10, states that a complete obstruction was found in the common femoral artery and removed during the March 31 operation.

The contradictions between Dr. Lillehei's testimony and the hospital records notwithstanding, plaintiffs have again failed to establish causation and negligence. First, there is no expert medical testimony and it is not within the realm of common experience and judgment of a layman to judge whether Dr. Lillehei was negligent in not exploring the common iliac artery at the time of the April 10 exploratory surgery. Second, even assuming there was a thrombosis in the common iliac artery, a fact which was not proven, there is no medical evidence that this thrombosis was the cause of the inadequate circulation in Donna's leg which led to the development of gangrene. Rather, the record indicates that the circulation problem was due to Donna's poor heart condition and the occlusion of the arteries below her knee caused by arteriosclerosis.

■ However, plaintiffs have made out a submissible case against Dr. Lillehei with regard to the administration of penicillin to Donna. The record shows that penicillin was prescribed by

---

6. The plaintiffs were not expressly informed that in 700 catheterizations performed in 1963 there were 27 cases where complications developed. The most common complication was the possibility of

irregular heart beat and this was explained to her. In a few cases there was a loss of leg pulse which was subsequently rectified. There was no case at this date involving a loss of a part of a limb.

Dr. Lillehei on March 31 and was administered on that occasion by Dr. Stasiuk and at least 11 other times by hospital personnel when they knew or should have known from hospital records that Donna was allergic to penicillin. Although no medical evidence was offered, it is within the common knowledge and experience of a layman to judge whether the drug caused the rash which appeared on Donna's arms and back and whether the prescription and administration of the drug under these circumstances constituted negligence. Although Dr. Lillehei neither administered penicillin to Donna nor was present to give personal supervision to its administration by the hospital personnel, any liability for administering the drug to Donna will be imputed to Dr. Lillehei under the doctrine of respondeat superior since subordinate medical personnel administered the drug only at his prescription. Swigerd v. City of Ortonville, 246 Minn. 339, 75 N.W.2d 217, 220–222 (1956). The monetary value of this claim, while not shown on the record, is apparently less than that necessary to support federal jurisdiction in a diversity case, but because Minnesota law, limiting tort actions against physicians to two years, M.S.A. § 541.07, appears to preclude any possibility of relief in the Minnesota state courts upon a dismissal without prejudice of this item of plaintiffs' claim, we think the District Court should consider retaining jurisdiction of this claim under the pendent jurisdiction principle.

The contention is also made that Dr. Stasiuk was negligent in using too large a tube for intubation in the course of administering anesthetic to Donna during the March 31 operation. This claim too must fail because there is no medical evidence as to negligence

and causation. There is no medical testimony that Dr. Stasiuk used too large a tube or that he otherwise improperly performed the intubation, and the admission of Dr. Stasiuk, which he. denies, that he used too large a tube does not alone make a jury issue on the question of negligence. Quickstad v. Tavenner, 196 Minn. 125, 264 N.W. 436 (1936).[7] Likewise, there is no medical evidence that establishes a causal connection between the March 31 intubation and Donna's throat problems which developed following her April 10 surgery and ultimately required a tracheostomy. The tracheostomy left no permanent disability in any event.

Viewing the evidence and the feasible inferences therefrom in favor of the plaintiffs, it appears the University Hospitals failed to accord Donna the reasonable care and attention that good hospital practices would dictate. The Puritan Pot used to ease her breathing difficulties was allowed to run dry on several occasions, and the nurses failed to respond when Donna was in critical need of personal attention on at least one instance. However, while a hospital is liable for the negligence of its nurses in performing administrative or clerical acts, Swigerd v. City of Ortonville, 75 N.W.2d at 222, we think the University of Minnesota Hospitals are immune from suit as a sovereign entity.

Under the Eleventh Amendment a state is immune from suit in federal court unless it consents. Article VIII, § 3 of the Minnesota Constitution provides that the University of Minnesota is an instrumentality of the state and expressly reserves all immunities to the University. The University of Minnesota Hospitals are of course a part of the Medi-

---

7. In *Quickstad* the Court noted that "whether the treatment constitutes malpractice can ordinarily be determined only by the aid of competent professional opinion defining, and sometimes applying, the proper standard." As to whether the defendant physician's admissions alone made a case for the jury, the Court stated:

"The answer is that, with truth assumed for all of the alleged admissions, it does not follow that defendant has been guilty of malpractice. There is still no evidence from which the jury could have found reasonably that he failed to perform the operation according to an accepted standard of his profession." 264 N.W. at 437.

cal School of the University. M.S.A. § 158.01.

While a state may expressly waive its constitutional immunity by an express consent to be sued in federal court, Minnesota has not done so. The State abolished the tort immunity of its political subdivisions in 1963, but it did not do so with respect to its own tort liabilities. M.S.A. §§ 466.01–.17.[8] Furthermore, while the State has waived its immunity in certain breach of contract cases, M.S.A. § 3.751 expressly provides that "[t]he state does not waive immunity with respect to claims of patients or other inmates of state institutions." Thus, although we find that plaintiffs' cause of action does not sound in contract, such cause of action would in any event be barred by the Eleventh Amendment due to the above exception of § 3.751.

We are fully cognizant that there is a trend toward restricting the doctrine of governmental immunity. However, this is not the forum in which that decision can be made. Resolution of this question must be left for the Minnesota Legislature or the Minnesota Supreme Court.

The judgment of the District Court is affirmed in all respects except that remand is made for the purpose of considering that part of the plaintiffs' claim relating to the administration of penicillin.

8. These statutes abolish governmental immunity from tort liability for "any city, whether organized under home rule charter or otherwise, any village, borough, county, town, public authority, public corporation, special district, school district, however organized, or other political subdivision." M.S.A. § 466.01. Although there are several old Minnesota cases which refer to the University of Minnesota as a public corporation, e. g., State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N.W. 951 (1928), these references were in an entirely different context and are of no assistance in determining whether the listing of public corporation in § 466.01 comprehends the University. However, we think the following corollary of the *ejusdem generis* rule and its rationale make clear that the Minnesota Legislature did not intend to include the University under the term public corporation:

"[W]here general words are subjoined to specific words, the general words will not include any objects of a class superior to that designated by the specific words. This corollary is based on the ground that when the legislature enumerates objects in descending order, objects of a higher order are ordinarily named at the beginning of the enumeration, and, if not so named, are not intended to be included within the statute at all." 2 J. Sutherland, Statutes and Statutory Construction § 4911 (Horack 3d ed. 1943) (footnotes omitted).