Kevin **KOHOUTEK** and Barbara Kohoutek, individually and as parents and Guardians Ad Litem of Nathan Kohoutek, a minor, Appellants,

v.

**R.J. HAFNER, M.D., et al., W.H. Wall, M.D., et al., St. Francis Hospital, Respondents.**

No. C6–84–1274.

Court of Appeals of Minnesota.

April 23, 1985.

Review Granted July 11, 1985.

Frank L. Racek, Lanier, Knox & Olson, Fargo, N.D., Robert Vogel, Grand Forks, N.D., for appellants.

Steven J. Cahill and Steven L. Marquart, Cahill, Jeffries & Maring, Moorhead, for respondents Breckenridge Clinic, Dr. Hafner.

Carlton J. Hunke, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., for respondents Wahpeton Clinic, Drs. Wall & Wiltsie.

Kate MacEachern, Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, for respondent St. Francis Hosp.

Heard, considered and decided by NIERENGARTEN, P.J., and FOLEY and CRIPPEN, JJ.

## OPINION

NIERENGARTEN, Judge.

This appeal is from an order denying a motion for judgment notwithstanding the verdict, or for a new trial, in a medical malpractice action. Appellants Barbara and Kevin Kohoutek claimed battery, negligent nondisclosure and negligent treatment by respondent doctors and hospital as a result of brain damage sustained by their child, Nathan Kohoutek, in delivery. Battery was not submitted and the jury rejected both negligence claims. We reverse on

the battery and negligent nondisclosure claims, affirm the finding of no negligent treatment, and remand the remaining issues for trial.

## FACTS

Barbara Kohoutek, expecting her first child, began visiting respondent Dr. W.H. Wall of the Wahpeton Clinic for prenatal care. The due date established for the pregnancy was October 8, 1982. When Barbara reached her forty-second week of pregnancy, Dr. Wall advised her that, the baby being large at that time, she should go into St. Francis Hospital for an attempt at inducing labor by injection of the drug Pitocin. She did so on October 22, but the attempt was unsuccessful and she was sent home.

She returned to see Dr. Wall on October 27. At that time, he advised her the best course of action would be to schedule a Cesarean section delivery for the 29th. Dr. Wasemiller, the Wahpeton Clinic surgeon who was to perform this operation, was consulted and agreed with this decision. Barbara Kohoutek signed a consent form for the Cesarean section and entered the hospital the following afternoon, October 28.

The admitting nurse that afternoon, Kim Hansen, noted that the bag of waters, or amniotic sac, was still intact. Kohoutek was placed on a fetal monitor, which showed slight, or mild, contractions. Kohoutek herself, however, did not feel she was having contractions.

Hospital policy required a second opinion in cases of Cesarean sections proposed for first-time mothers. Dr. R.J. Hafner was contacted by the nurse for a consultation at approximately 8 p.m. Dr. Hafner gave Kohoutek a pelvic exam, noting, by means of a nitrazine test, leakage of amniotic fluid. Although Kohoutek was not aware of a rupture of the membrane, Dr. Hafner believed that a rupture had occurred. Due to the risk of infection, Dr. Hafner thought Pitocin should be injected to augment, or speed, the process of natural labor which had begun.

The attending physician, Dr. Wall, could not be reached. Dr. Wiltsie, also of the Wahpeton Clinic, was called and agreed to the Pitocin injection.

Dr. Hafner admitted she did not discuss with Kohoutek the specific risks of vaginal delivery. In Hafner's judgment the risks of infection were greater than the risks of delivery. The three witnesses—Kohoutek, Dr. Hafner and Nurse Hansen—agreed that Kohoutek said she would like to wait until her husband arrived, sometime after 9 p.m., and that Kohoutek expressed her desire not to have a vaginal delivery. Hafner and Hansen, however, testified that the reason given was that the Kohouteks' insurance covered Cesarean but not vaginal delivery. The nurse noted that Kohoutek was "confused about being induced." The hospital did not obtain a consent form specifically covering the Pitocin injection.

The Pitocin intravenous injection was begun at 8:50 p.m. Although Kohoutek voiced objections, she did not refuse the IV. Her husband and Dr. Wall arrived some time after 9 p.m. Dr. Wall admitted he was "displeased" that the induction was occurring, but did not change the course of treatment back to the Cesarean section.

The Pitocin injection continued into the following morning, when the second stage of labor began. The head of the child was delivered at 2:28 a.m., but Dr. Wall was unable to deliver the shoulders due to a condition known as shoulder dystocia. He called for assistance. The shoulders were not delivered until 2:50 a.m., by which time the baby had become blue. The Apgar score was zero (no signs of life) for 14 minutes after birth. Drs. Wall and Wiltsie were able to resuscitate the child but not before brain damage had occurred.

The trial court declined to submit the claim of battery to the jury on grounds which do not appear in the record. The court instructed the jury on the standard of care applicable to physicians and the elements of a claim of negligent nondisclosure. The court instructed the jury that consent to treatment could be either ex-

press or implied, but did not define the circumstances under which consent could be implied. The special verdict asked the jury to determine whether the actions of the physicians and hospital "amounted to malpractice."

## ISSUES

1. Did the trial court err in failing to submit the claim of battery to the jury?

2. Did the trial court err in its instructions to the jury or in the framing of the special interrogatories to be answered by the jury?

3. Was the evidence sufficient to sustain the jury's findings of no negligence in treatment or in the disclosures made to the Kohouteks?

## ANALYSIS

### I

At trial, the doctors and hospital argued the supreme court's decision in *Kinikin v. Heupel*, 305 N.W.2d 589 (Minn.1981), indicating that battery and negligent nondisclosure may be redundant theories of liability, precluded the submission of both theories in this case. They also argued that, since Pitocin was used merely to augment natural labor, the injection could not be considered a battery.

■ This is not the classic battery claim which arises out of an operation during which the scope of the patient's consent is exceeded while the patient is unconscious. *See, e.g., Kinikin v. Heupel*, 305 N.W.2d 589 (Minn.1981). Injection of a drug into a patient without his consent, however, has been held to constitute a battery. *See Stowers v. Ardmore Acres Hospital*, 19 Mich.App. 115, 124–27, 172 N.W.2d 497, 502–03 (1969); *cf. Campbell v. Glenwood Hills Hospital, Inc.*, 273 Minn. 525, 142 N.W.2d 255 (1966) (treatment carried out under court order). Given the general extension of assault and battery principles to the area of medical treatment, a finding of battery for an injection given to a conscious patient is amply justified in this case. A person has a "right to deter-

mine what shall be done with his own body." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Since battery is an unconsented touching, the same issue of informed consent arises as in a claim of negligent nondisclosure, first recognized in *Cornfeldt v. Tongen*, 262 N.W.2d 684, 699 (Minn.1977).

■ The hospital counters by arguing an injection of a hormone intended to induce or augment labor cannot be a battery because vaginal delivery is the natural outcome of pregnancy. The contention loses impact when the hospital's own "Pregnant Patient's Bill of Rights," given to Mrs. Kohoutek prior to her hospitalization, included this language:

THE PREGNANT PATIENT HAS THE RIGHT, prior to the administration of any *drug* or procedure, to be informed by the health professional caring for her of any potential direct or indirect effects, risks or hazards to herself or her unborn or newborn infant which may result from the use of a *drug* or procedure * * *.

(Emphasis added).

■ The next question is the sufficiency of the record to show lack of consent. There were three persons present with Mrs. Kohoutek at one time or another during the ordering and performing of the Pitocin injection. All three testified Kohoutek was opposed to, or at least confused about, the change in treatment from Cesarean to induced natural delivery, and that she objected to the Pitocin injection. Nurse Hansen wrote into the Labor and Delivery Record: "Patient confused about being induced."

An attempt to show an implied consent by such assertions as she "verbalized understanding" of the procedure and "did not adamantly refuse the IV," does not dilute the evidence of non-consent. The record raises a fact issue as to whether consent was given or whether a battery occurred. The battery claim should have been submitted to the jury.

The hospital may be liable for the intentional torts of the nurses if they are committed within the scope of their employment. *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.,* 329 N.W.2d 306, 310 (Minn.1983). But where a doctor takes over the direction and control of a nurse's work, the doctor may become liable under the borrowed servant doctrine. *See Synnott v. Midway Hospital,* 287 Minn. 270, 273–74, 178 N.W.2d 211, 213 (1970).

Here, the Pitocin injection was ordered as a result of the hospital's policy requiring a consultation before a Cesarean. The nurses, however, in performing the injection, were acting under the orders of either Dr. Hafner or Dr. Wiltse, neither of them hospital employees. They became borrowed servants, thereby relieving the hospital from liability.

The record does not adequately reveal which physician ordered the Pitocin injection. A remand is required to fix liability and determine damages.

## II

Kohouteks objected to the phrasing of the special verdict interrogatories in terms of "malpractice", and to the trial court's failure to instruct the jury that consent could not be implied except in an emergency or an emergency arising during an operation.

The trial court's instruction on consent to treatment was not erroneous. Assuming disclosure sufficient to make such a consent informed, consent may be implied from the conduct of a patient as well as from emergency conditions.

Although trial courts have broad discretion in determining the form of interrogatories in a special verdict, *Hill v. Okay Construction Co.,* 312 Minn. 324, 340, 252 N.W.2d 107, 118 (1977), they should define the terms employed in the interrogatories. Here, the term "malpractice" was not defined in the court's instructions. It instructed on the doctor's duty of care, but the term "malpractice" only appears in a

reference to the burden of proof on causation "[i]n a medical malpractice case."

We believe a jury should not ordinarily be asked to arrive at its own understanding of what the term "malpractice" means. The court's interrogatories to a jury, like the instructions themselves, should "be clear and precise so as to leave no likelihood of confusion" or erroneous inference. *Pomush v. McGroarty,* 285 N.W.2d 91, 94 (Minn.1979) (Scott, J., dissenting) (citing *Wolle v. Jorgenson,* 256 Minn. 462, 99 N.W.2d 57 (1959)). The term "malpractice", because it was not defined in the jury instructions, left the jury free to infer or to speculate on a term that conceivably suggested a higher standard of proof than ordinary negligence.

We believe the trial court's failure to define "malpractice", combined with the court's failure to distinguish in the interrogatories between negligent treatment and negligent nondisclosure, which we now address, requires reversal. *See Malik v. Johnson,* 300 Minn. 252, 259, 219 N.W.2d 631, 636 (1974).

Negligence in treatment and negligent nondisclosure are two separate and distinct theories of malpractice. While negligent treatment is governed by the accepted medical practice standard, a physician may be liable for negligent nondisclosure even if disclosure is not required by that standard. *Cornfeldt v. Tongen,* 262 N.W.2d 684, 701–02 (Minn.1977).

The Wisconsin Supreme Court addressed this issue in *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 227 N.W.2d 647 (1975):

> The plaintiffs allege that Dr. Kamper was negligent in two respects. One, in the care and treatment given and, two, in failing to adequately inform Scaria of the risks involved in the procedure. The question as submitted is not erroneous, especially in view of the fact that the instructions treated the two duties separately. However, because the standards by which these duties must be measured

are somewhat different, we are of the opinion that upon proper motion or request the questions should be stated separately.

*Id.* at 20, 277 N.W.2d at 657.

Here, where the negligence issue was not only undifferentiated but was submitted in terms of "malpractice", a term undefined in the instructions, the possibility of confusion and erroneous inference by the jury is so apparent as to require reversal unless the error proves to be harmless.

## III

■ The trial court's failure to distinguish between negligent treatment and negligent nondisclosure is harmless if the evidence is insufficient to support a verdict for the Kohouteks on either negligence claim. *See McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 96, 235 N.W.2d 371, 374 (1975).

### a. *Negligent nondisclosure*

■ The elements of an action for negligent nondisclosure are as follows:

A plaintiff must demonstrate (1) a duty on the part of the physician to know of a risk or alternative treatment plan; (2) a duty to disclose the risk or alternative program, which may be established by a showing that a reasonable person in what the physician knows or should have known to be the plaintiff's position would likely attach significance to that risk or alternative in deciding whether to consent to treatment; (3) breach of that duty; (4) causation (the undisclosed risk must materialize in harm); and (5) damages.

*Plutshack v. University of Minnesota Hospitals,* 316 N.W.2d 1, 9 (Minn.1982).

■ Shoulder dystocia was a risk known to the respondent physicians. It was a risk which was not disclosed to the Kohouteks and which caused Nathan Kohoutek's injuries.

Experts for both sides accepted the incidence of shoulder dystocia in infants over 4000 grams (8 pounds, 8 ounces) to be 1.7 percent. Dr. Wall conceded that this was a substantial risk. He had noted on October 20 that the child was large and had told Mrs. Kohoutek on October 27 that it appeared to have grown larger. Nathan Kohoutek weighed 10 pounds 8 ounces at birth.

There was also expert testimony from which the jury could have concluded the size of the child, and the fact that it was post-term, so significantly increased the risk of shoulder dystocia that the risk should have been disclosed to Mrs. Kohoutek.

The court in *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir.1971), held that a 4% undisclosed risk involved in a catheterization procedure did not vitiate the patient's consent to the procedure. In *Walstad,* the 4% figure was for all involved risks, "most of which were not serious." *Id.* at 640. Here, a smaller 1.7 percent risk also included much less serious degrees of dystocia, but, unlike the risk in *Walstad,* may have been magnified by known variables, such as the size and maturity of the child.

### b. *Negligent treatment*

■ The Kohouteks claimed Dr. Hafner's consultation violated accepted medical standards, that the decision to alter treatment from Cesarean section to natural delivery was negligent, and that the methods of resuscitation and the equipment and personnel available in the delivery room were below medical standards.

Dr. Hafner's consultation may have violated standards in that she did not have all available information and did not discuss her recommendation with Dr. Wall, the attending physician. There was no showing, however, that the consultation caused Nathan Kohoutek's injuries. The record established that when Dr. Wall arrived, he could have halted the Pitocin injection and its effects, and performed the Cesarean, but didn't.

As to the change in treatment, the fact that Kohoutek had gone into an early stage of labor after admittance to the hospital could have altered the critical factor in the earlier decision to schedule a Cesarean. In other words, it was urgent to get Mrs. Kohoutek, then in her 43rd week, delivered. Even though both of the Kohouteks' experts testified that, because of the large size of the baby and the fact it was that much overdue, a vaginal delivery then did not meet acceptable medical standards, there was sufficient expert testimony from which the jury could find no negligent treatment.

The Kohouteks claimed Dr. Wall had little or no training in shoulder dystocia, that a nurse-anesthetist should have been present at the time of delivery, and that an infant ventilator or resuscitator should have been available in the delivery room.

The local, community standard for medical malpractice must be applied. *Christy v. Saliterman*, 288 Minn. 144, 165, 179 N.W.2d 288, 301 (1970). The respondent physicians are family practitioners practicing in a small rural hospital. Kohouteks' experts demonstrated little familiarity with small rural community hospitals, and could not testify that the treatment given or facilities available violated standards applicable to such hospitals. Thus, proof of hospital negligence was not adequately established and the jury's verdict on that issue must be affirmed.

## DECISION

The record raises a fact issue as to whether the injection of Pitocin was a battery. The issues of liability and damages are remanded. The evidence is sufficient to raise an issue of negligence in nondisclosure of the risk of shoulder dystocia, and that issue is also remanded for trial. The evidence is insufficient to support the claims of negligent care and treatment.

Affirmed in part, reversed in part and remanded.