Kevin KOHOUTEK and Barbara Kohoutek, individually and as parents and Guardians Ad Litem of Nathan Kohoutek, a minor, Respondents,

v.

R.J. HAFNER, M.D., et al., Petitioners, W.H. Wall, M.D., et al., Petitioners, Appellants,

St. Francis Hospital, Respondent.

No. C6-84-1274.

Supreme Court of Minnesota.

March 14, 1986.

Carlton J. Hunke, Pamela J. Hermes, Fargo, N.D., for W.H. Wall.

Steven J. Cahill, Steven L. Marquart, Moorhead, for R.J. Hafner.

Frank L. Racek, Fargo, N.D., for Kevin Kahoutek.

Paul E. Grinnell, Moorhead, for St. Francis Hosp.

SCOTT, Justice.

Defendants in a medical malpractice suit seek further review of a decision of the Minnesota Court of Appeals. The defendants were found not to be liable after a trial in the Wilkin County District Court. The court of appeals reversed and granted a new trial on the issues of battery and negligent nondisclosure. We now reverse the court of appeals and reinstate the judgment of the district court.

In early 1982, Barbara Kohoutek became pregnant with her first child. For her prenatal care, Kohoutek consulted Dr. W.H. Wall, a physician practicing medicine in Wahpeton, North Dakota. Dr. Wall cared for Kohoutek during the entire term of her pregnancy, which was uneventful except for Kohoutek's slightly elevated blood pressure on one visit to the clinic. Dr. Wall estimated Kohoutek's date of delivery at October 8, 1982.

By October 20, Kohoutek had not gone into labor. Dr. Wall suggested that labor be induced and, on October 22, he attempted to stimulate labor with the drug Pitocin, a synthetic hormone. The Pitocin induction was ineffective, however, and on October 27, Dr. Wall advised Kohoutek that a cesarean section should be performed. One of the physicians practicing medicine with Dr. Wall, Dr. Wasemiller, concurred with Dr. Wall that a cesarean section was warranted. The surgery was scheduled for the morning of October 29.

On the afternoon of October 28, Kohoutek was admitted to St. Francis Hospital in Breckenridge, Minnesota, for the scheduled cesarean section the following morning. An obstetrical nurse performed a physical examination of Kohoutek and noted that she was experiencing mild contractions at two-to-three-minute intervals. The obstetrical nurse notified the charge nurse, who attempted to call Dr. Wall. Dr. Wall, however, could not be reached, and at approximately 7:15 p.m. Dr. G.H. Wiltse, a physician who practiced with Dr. Wall, was contacted and informed that Kohoutek was in the early stages of labor. Dr. Wiltse instructed the nursing staff to proceed with a vaginal delivery.

At approximately 8:00 p.m., Dr. R.J. Hafner, a physician affiliated with the hospital, examined Kohoutek. The hospital required that a second opinion be obtained from a neutral physician before any major gynecological surgery was performed, and the

hospital had arranged for Dr. Hafner to examine Kohoutek that evening to establish the need for Kohoutek's scheduled cesarean section. Upon examining Kohoutek, Dr. Hafner too noted that Kohoutek was experiencing mild contractions. She performed a Nitrazine test, which indicated leakage of amniotic fluid. The doctor concluded that Kohoutek was in the early stages of labor and recommended to Dr. Wiltse that the labor be augmented by the use of Pitocin in order to minimize the risk of infection. By phone, Dr. Wiltse, who was caring for Dr. Wall's patients during his absence, ordered that Pitocin be administered to Kohoutek. Intravenous administration of the drug was begun at 8:50 p.m.

Shortly after 9:00 p.m. Dr. Wall returned to the hospital to perform a pre-cesarean examination of Kohoutek. Although somewhat surprised that Kohoutek was receiving Pitocin, Dr. Wall was informed that she had begun experiencing mild contractions that afternoon. Dr. Wall did not order the Pitocin stopped, but told Kohoutek that he was going to monitor her labor. By midnight, he saw no reason to do a cesarean section.

At 1:40 a.m. Kohoutek went into the second stage of labor, and the Pitocin IV was discontinued. At 2:28 a.m. the baby's head emerged. A condition known as shoulder dystocia developed, however. One of the baby's shoulders became caught up on Kohoutek's pelvic bone, halting the delivery at that stage. Dr. Wall called for assistance from Dr. Wiltse. Finally, at 2:50 a.m., some twenty-two minutes after the head emerged, the doctors delivered the baby. By this time, however, the infant had become cyanotic. Its Apgar score was zero; there were no signs of life. The doctors were able to resuscitate the child, but severe brain damage had occurred as a result of oxygen deprivation.

Kohoutek brought suit, alleging negligent treatment on the part of physicians Wall, Wiltse, and Hafner and facilities Breckenridge Clinic, Wahpeton Clinic, and St. Francis Hospital. Kohoutek also specifically alleged that physicians Hafner and Wiltse ordered and directed the injection of Pitocin into Kohoutek without her consent, thus constituting a battery. A jury trial commenced on May 1, 1984.

At trial, Dr. Hafner testified that after examining Kohoutek on the night of October 28, she explained to Kohoutek that she was in the early stage of delivery and that an intravenous line of Pitocin would be started to improve the quality of her labor. Dr. Hafner also testified that she told Kohoutek there was a chance that she would deliver her baby vaginally and that it was not advisable, in her opinion, to wait until the following morning for delivery by cesarean section because it was not known precisely how long the amniotic fluid had been leaking. The doctor admitted, however, that she did not discuss with Kohoutek the risks of a vaginal delivery.

Kohoutek testified that she told Dr. Hafner that before any decision was made concerning a vaginal delivery she would like to discuss the matter with her husband, who was scheduled to arrive at the hospital sometime after 9:00 p.m. She also stated that she asked to talk to Dr. Wasemiller. However, she did not refuse the Pitocin when an intravenous line of the drug was started at 8:50 p.m.

Dr. Wiltse testified that, upon receiving a call from Dr. Hafner, he ordered the intravenous line of Pitocin to be administered to Kohoutek in order to deliver the baby as soon as possible. He was also concerned about possible infection.

Dr. Wall testified that initially he was disturbed that Kohoutek had been given Pitocin, to facilitate a vaginal delivery, while he was away. However, after being informed that Kohoutek had earlier experienced mild contractions, he considered a vaginal delivery the correct procedure to follow. He admitted that he did not discuss with Kohoutek, on October 28, the risks of vaginal delivery.

At the conclusion of the evidence, the trial court instructed the jury on the issues of negligent treatment and negligent nondisclosure. The court gave no instructions on the claim of battery. A special verdict

form, which asked whether the conduct of each of the defendants amounted to malpractice, was submitted to the jury. The jury returned a verdict in favor of all the defendants and the trial court denied Kohoutek's motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Kohoutek appealed to the court of appeals.

The appellate court held that the evidence supported the verdict that the defendants were not liable under the theory of negligent treatment. However, it reversed the trial court's determination not to submit a claim of battery to the jury and reversed the trial court's special verdict form, which asked whether the defendants were guilty of malpractice and which did not distinguish between claims of negligent treatment and negligent nondisclosure. *Kohoutek v. Hafner*, 366 N.W.2d 633 (Minn.Ct.App.1985).

We accepted the defendants' petition for further review and now discuss whether the trial court abused its discretion (1) in not submitting the claim of battery to the jury; (2) in not defining the term "malpractice" in its instructions to the jury; or (3) in using the term "malpractice" in the special verdict form.

1. Kohoutek contends that the trial court erred when it did not submit to the jury her claim of battery. The court of appeals agreed, and reversed and remanded. The defendants, however, argue that the trial court's negligent nondisclosure instruction encompassed any claim of battery. They note that it would have been redundant to submit both a claim of negligent nondisclosure and a battery claim to the jury.

In *Mohr v. Williams*, 95 Minn. 261, 104 N.W. 12 (1905), we recognized that a claim of battery lies against a physician who performs a medical procedure on a patient without his or her consent. A battery claim was warranted because Mohr had consented to an operation on her right ear but Williams performed the procedure on her left ear. No evidence of wrongful intent or negligent action on the part of

Williams was admitted; nevertheless, we stated:

> It would seem to follow from what has been said on the other features of the case that the act of defendant amounted at least to a technical assault and battery. If the operation was performed without plaintiff's consent, and the circumstances were not such as to justify its performance without, it was wrongful; and, if it was wrongful, it was unlawful.

*Id.* at 271, 104 N.W. at 16.

We acknowledged in *Bang v. Charles T. Miller Hospital*, 251 Minn. 427, 88 N.W.2d 186 (1958), that when a physician fails to disclose to the patient a very material aspect of the nature and character of the operation to be performed, a claim of battery lies because any supposed consent is undermined and there is thus an unpermitted touching. In *Bang*, the patient consented to a prostate operation; however, he was not aware that a necessary part of the operation entailed the severance of his spermatic cords. The physician could not recall having told the patient that the spermatic cords would be severed as a part of the prostate procedure. We noted:

> [I]n a situation such as the case before us where no immediate emergency exists, a patient should be informed before the operation that if his spermatic cords were severed it would result in his sterilization, but on the other hand if this were not done there would be a possibility of an infection which could result in serious consequences. Under such conditions the patient would at least have the opportunity of deciding whether he wanted to take the chance of a possible infection if the operation was performed in one manner or to become sterile if performed in another.

*Id.* at 434–35, 88 N.W.2d at 190.

In *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn.1977), we joined the growing number of jurisdictions recognizing an action for negligent nondisclosure. Unlike the patient in *Bang*, who did not understand the nature and character of the medical proce-

dure performed on him and thus was allowed to sue for battery, the patient in *Cornfeldt* understood the exact nature of the operation she underwent. It was alleged, however, that her physician failed to inform her of the *risks* of undergoing the procedure. Unlike a battery, a failure by a physician to disclose a risk that may arise in the course of a medical procedure or treatment constitutes negligence. The notion is that a physician has a duty to disclose risks attendant to proposed or alternative methods of treatment, a duty that will arise if the physician knew or should have known of such risks.

Confusion over the exact theoretical boundaries of battery and of negligent nondisclosure has resulted in this and other jurisdictions recognizing both battery and negligent nondisclosure claims in medical malpractice cases. In *Kinikin v. Heupel*, 305 N.W.2d 589, 593–94 (Minn.1981), we noted that the submission of both a battery and a negligent nondisclosure claim may be redundant and may result in an inconsistent verdict. Today we reaffirm such concerns and set out to delineate the boundaries between the two claims.

■ In the medical malpractice context, battery consists of an unpermitted touching, in the form of a medical procedure or treatment. The touching is permitted if the patient consents to it. Under some circumstances, however, the patient's consent can be vitiated. *Bang* represents such a case: failure to disclose a very material aspect of the nature and character of the touching will undermine the consent, and the touching will constitute a battery. Consent, however, is not rendered void when a patient is touched in exactly the way to which he or she has consented. To argue that consent that is inadequately informed is no consent at all, and hence a battery, is to ignore the practical differences underlying the distinction between battery and negligent nondisclosure.

■ The first practical difference concerns the focus of the inquiry. In battery, the focus is on the patient's right to be free from a touching that is of a substantially different nature and character from that to which he or she has consented. Thus, the physician sued in a battery case has very few defenses. In a negligent nondisclosure case, however, the focus is on the physician's duty to inform the patient of the risks of certain medical procedures and, as a result, several factors are considered in determining liability. For example, if an adverse psychological effect on the patient will result from the physician's disclosure of the risk, the duty to disclose such a risk to the patient may not arise.

■ Another practical difference between battery and negligent nondisclosure claims involves the method of proving the unlawful act. In battery cases, no expert testimony need be adduced, for the question is whether the physician, in fact, told the patient of the nature and character of the procedure and the patient consented to that procedure. In negligent nondisclosure cases the issue is whether the physician *should* have informed the patient of the risks involved in the procedure. Thus, the admittance of expert testimony concerning the duty of care in the applicable medical community is necessary.

■ Establishing the causal relationship also differs in the two cases. In a claim of battery, causation is easily proven. It need only be shown that the medical procedure performed was substantially different than that to which the patient consented. In negligent nondisclosure cases, however, the patient cannot establish the cause of action merely by showing that the medical procedure took place. The patient must prove that a reasonable person in the patient's position would have refused the treatment had the physician disclosed the risk.

Distinguishing between claims of battery and claims of negligent nondisclosure thus has a practical significance. It is also necessary for rational decisionmaking. *See* McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment*, 41 Minn.L.Rev. 381 (1957); Plante, *An Analysis of "Informed Consent,"* 36 Fordham

L.Rev. 639 (1968). The question with which we are confronted in this case is: on which side of this delineation does Kohoutek's case fall?

The gist of Kohoutek's claim is one of negligent nondisclosure. Kohoutek entered the hospital to have a cesarean section. Dr. Wall had earlier discussed with her the risks such a procedure presents. She considered those risks and decided to have the operation. Upon entering the hospital she began experiencing mild contractions. Kohoutek eventually entered the early stages of labor, and Pitocin was administered to facilitate this stage of her delivery. When it became evident that a vaginal delivery was possible, Kohoutek claims, she should have been informed of the risks such a delivery presented. Kohoutek was nearing her forty-third week of pregnancy and her baby was quite large. At this late stage of pregnancy certain risks increase and she alleges that she should have been able to weigh these risks against those of a cesarean section.

■ The issue is not whether Kohoutek consented to a vaginal delivery; it is whether she was informed of its risks. Such is the stuff of negligent nondisclosure. The jury was properly instructed on the elements of that tort, and we adhere to its verdict. It was not an abuse of discretion for the trial court to disallow a claim of battery, and we reverse the court of appeals on this issue.

2. Kohoutek contends that the trial court abused its discretion in not defining the term "malpractice" in its instructions to the jury. By failing to define the term, Kohoutek argues, the court implied to the jury that a higher burden of proof than negligence was required in order to find liability.

We have recognized that trial courts are afforded considerable latitude in formulating jury instructions. In *Cameron v. Evans*, 241 Minn. 200, 62 N.W.2d 793 (1954), we stated:

[T]he charge of the trial court must be viewed in its entirety and from a practical and commonsense point of view. The trial court is allowed considerable latitude in the language used, and a new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law. All that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law. It is unnecessary that every possible opportunity for misapprehension be guarded against. If the charge fairly lays down the law of the case, it is sufficient.

*Id.* at 208–09, 62 N.W.2d at 798–99 (footnotes omitted). *See also Busch v. Busch Construction, Inc.*, 262 N.W.2d 377, 396 (Minn.1977).

■ The standard enunciated in *Cameron* was met in this case. Although the trial court did not define the term "malpractice" to the jury, its use of that term, along with "negligence" in its instructions, in effect provided the jury with a definition—that the two terms were one and the same. The pertinent part of the trial court's instructions reads:

The plaintiffs claim that the doctors and hospital acted in a negligent manner and that these actions were a direct cause of the injuries to Nathan Kohoutek. These claims cover the period after Barbara Kohoutek was admitted to the hospital, during the labor and delivery, and during the resuscitation of Nathan Kohoutek.

The plaintiff has the burden of proving its case.

Now, negligence is the failure to use reasonable care. Reasonable care is that care which a reasonable person would use under like circumstances.

Negligence is the doing of something which a reasonable person would not do or the failure to do something which a reasonable person would do under like circumstances.

To establish negligent care and treatment, the plaintiff must demonstrate first the standard of care recognized by the medical community as applicable to

the particular defendant's conduct. Second, that the defendant in fact departed from that standard. And third, that the defendant's departure from the standard was a direct cause of Nathan's injuries.

In a medical malpractice case, the plaintiff has the burden of showing that it is more probable that the injury resulted from some negligence for which the defendant was responsible than for something for which he was not responsible.

Because the court used the term "malpractice" interchangeably with the word "negligence," it did not imply to the jury that malpractice required a higher standard of proof than negligence.

Moreover, counsel for Kohoutek used "malpractice" and "negligence" interchangeably in his arguments to the jury. The transcript reads, in part:

I just want to talk about two general defenses, so-called, that the defense has been talking about directly and indirectly. One is that everything the doctors did in this case is a matter of judgment. Well, in a sense it was, but the rule in negligence cases, and malpractice cases, included in negligence cases, is it must be good judgment. It must be judgment that conforms with the standard of care of other physicians in similar circumstances or if they are specialists with other specialists in similar circumstances.

The transcript further reads:

Well, the verdict form, if you decide in favor of the Kohouteks and believe that there is negligence and that they are entitled to compensation, you must say yes to some of the questions as to whether there was malpractice on the verdict form. There is a separate question for each of the defendants. And you decide which, we think all. You can decide whether all or only some of them are negligent and put in a yes beside the appropriate name and later on you get down to questions about damages which are self-explanatory.

Because no confusion is evident in this case, we decline to grant Kohoutek a new trial and reverse the court of appeals on this issue.

■ 3. The court of appeals concluded that because the special verdict form asked whether the defendants committed malpractice, and did not differentiate between negligent nondisclosure and negligent treatment, the possibility of confusion of the jury warranted reversal. 366 N.W.2d at 638. In reaching its conclusion, however, the appellate court failed to consider the trial court's instructions, which clearly distinguish between Kohoutek's claim of negligent treatment and her claim of negligent nondisclosure.

The trial court first instructed the jury on the elements constituting the tort of negligent treatment. The court noted that in order to establish negligent treatment the plaintiff must demonstrate the "standard of care recognized by the medical community as applicable to the particular defendant's conduct." The court then stated that the plaintiff must establish that the defendant in fact departed from that standard. Finally, the court instructed the jury that the plaintiff must prove that "the defendant's departure from the standard was a direct cause of Nathan's injuries."

Later, the trial court instructed the jury on the elements of the tort of negligent nondisclosure. The instructions read:

Ordinarily, a doctor may not treat a patient without the patient's consent stated directly or implied. A patient has the right of self-determination as to medical treatment. A physician may be liable for negligent nondisclosure if the patient was not properly informed of a risk inhering in the treatment, if the undisclosed risk materialized in harm, and consent to the treatment would not have been secured if the risk were disclosed.

Before a physician can be liable for negligent nondisclosure you must find the following four conditions existed:

First, the physician knew or should have known of a risk of the treatment.

Second, standard medical practice would require disclosure of the risk, or

the physician knew or should have known that the patient would attach significance to the undisclosed risk.

Third, had a reasonable person been informed of the risk she would not have consented to the procedure.

And fourth, that the undisclosed risk materialized in harm as a result of the treatment.

We have noted that trial courts have considerable discretion in formulating special verdicts. *See Gravley v. Sea Gull Marine, Inc.*, 269 N.W.2d 896, 900 (Minn. 1978). Here, the trial court in its instructions discussed, in detail, the elements of negligent nondisclosure and the elements of negligent treatment. The two claims were presented separately and, despite the reference in the special verdict form to the more general term "malpractice," the jury was reasonably informed of the two separate claims in negligence. We thus reverse the court of appeals on this issue also.

Reversed.

KELLEY, J., concurs specially.

YETKA, J., dissents.

KELLEY, Justice (concurring specially).

I join the majority opinion. The author of the opinion, in my view, has clearly demonstrated that *in this case,* when considered in their totality, the instructions given by the trial judge adequately apprised the jury of the plaintiffs' claims and the law applicable thereto.

However, Justice Yetka in dissent states a valid point. The use of the word "malpractice" in either instructions or in interrogatories on the verdict form can indeed be misleading. "Malpractice" has no more legal meaning than does "automobile accident." The phrase should not be used either in instructions or on verdict forms. In a claim against a physician, the allegation may be that the defendant physician has committed a battery, or has been negligent, or both. However, as the majority correctly points out, in my opinion, this case is one where the claim was of negligent disclosure, not battery. The jury was properly instructed on the tort of negligent disclosure. For that reason, I concur in the opinion.

YETKA, Justice (dissenting).

As far as the strength of the plaintiffs' case is concerned, it can be debated whether they will prevail even on a retrial. That is, however, beside the point. The trial court made three errors in this case, and I think the cumulative effect of these errors is to deny the plaintiffs a fair trial. First, the trial court erred when it failed to instruct the jury on a claim of battery. Second, it erred when it did not define the term "malpractice" used in the special verdict form. The court's third error was in not distinguishing between negligent nondisclosure and negligent care and treatment in the special verdict form. I agree with the appellate court that these errors were prejudicial and a new trial should be ordered.

It is admitted that the plaintiffs asked for, but never received, an instruction on battery. There was strong evidence here that the patient was under intense pressure to agree to induce labor, and the trial court should, therefore, have given instruction on battery. She was in the hospital because Dr. Wall, who treated her throughout the pregnancy, convinced her that her baby was long overdue and that it would be safer to deliver the baby by cesarean section. The surgeon had already been selected. The patient was in the hospital the night before and was to be examined by Dr. Hafner since, under hospital policy, a second opinion was necessary for such surgery. Upon examination, the patient was told that she had already commenced natural labor and the doctor recommended that labor be induced by drugs. The patient wanted her husband, her doctor or the surgeon to be present. Her husband was due to arrive sometime within the hour, Dr. Wall was out of town, and she was told the surgeon was bowling. Much is made by the defense that the plaintiff, at that point, did not object to induced labor. She did not, of course, verbally protest or get her-

self out of bed. One cannot imagine a more coercive atmosphere or expect someone to do more to object than did this patient.

There is no separate cause of action for malpractice, for it is a form of negligence. *See, e.g., Manion v. Tweedy,* 257 Minn. 59, 100 N.W.2d 124 (1959); W. Prosser, *Handbook of the Law of Torts* § 32, at 161–66 (1971). The cause of action in this case was either for negligence or for battery. Yet, the jury verdict form only presented a question as to whether the doctors were guilty of "malpractice."

Furthermore, there was no distinction made in the court's special verdict form between negligent non-disclosure and negligent care and treatment. Such distinction was necessary under the facts of this case, and use of the general term "malpractice" was not sufficient.

The lack of proper instructions is demonstrated by the fact that the jury was confused and came back for additional instructions on the issue of consent. It appears that the jury wanted all the court's instructions, but the judge refused to allow the jury to take them into the jury room. The judge, rather than giving them all of his instructions, merely repeated that form of instructions dealing with consent. Who can say what the effect would have been on the jury if it had been properly instructed on battery versus negligence and if proper interrogatories had been presented on each of two issues?

It is not for an appellate court to decide whether plaintiffs ought to prevail, but it is our duty to see that the plaintiffs get a fair trial. I think the court of appeals was correct in ordering a new trial. Accordingly, I would affirm.